IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESSICA BERGER, ET AL, <br><br> Plaintiffs, <br> v. <br><br> PERRY'S STEAKHOUSE OF ILLINOIS, LLC., D/B/A PERRY'S STEAKHOUSE AND GRILLE, ET AL, <br><br> Defendants. | Case No: 1:14-cv-08543 <br><br> Judge:  Thomas M. Durkin |

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
# ITS MOTION FOR SUMMARY JUDGMENT

For the reasons stated herein, and on the basis of the summary judgment evidence submitted simultaneously with this Memorandum pursuant to Local Rule 56.1(a)(3), Defendants (referred to collectively as "PSI") seek judgment in their favor pursuant to FED.R.CIV.P. 56 as to Plaintiffs' claim for liquidated damages in connection with the credit card offset fee policy because the undisputed evidence cannot support a bad faith finding; as to Plaintiffs' pending claims for damages for unpaid wages under the FLSA and the IMWL on the basis of their sidework claim because all of the side work they performed was properly compensated as part of the tipped wages; as to their tip pool claim because there is no evidence that tip monies were retained by the "house" as alleged in the Complaint: and as to their notice claim because the undisputed evidence shows that they received adequate notice of the information pertaining to their tip compensation.  They also seek dismissal of Plaintiffs' state law common law claims for breach of contract and unjust enrichment.

1

# I. INTRODUCTION

## A. SUMMARY JUDGMENT STANDARD

The burden of proof in a Rule 56 judgment proceeding is on the same party who would bear the burden at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Plaintiffs therefore retain the burden of proof on all of their affirmative claims. Regarding the good faith issue, if PSI meets its burden of proof, then to avoid summary judgment Plaintiffs must either present sufficient evidence that negates an essential element of PSI's good faith defense or demonstrate that there is an absence of evidence regarding the defense. *See Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014).

## B. ISSUES ADDRESSED IN THE MOTION

PSI addresses the following issues raised by Plaintiffs in their Complaint:[1]

(a) Liquidated damages as to the so-called "credit card offset fee policy;"[2]

(b) Sidework Claim;

(c) Tip Pool Claim;

(d) Notice Claim; and

(e) Common law claims.

References to the Fair Labor Standards Act ("FLSA") herein should be taken to include references to any other statutory claim invoked by Plaintiffs in this case.

---

[1] References to the "Complaint" are to Plaintiffs' latest such operative pleading, the Fourth Amended Complaint. **Dkt. No.** 121.

[2] This Court can further take judicial notice of information contained in pleadings Plaintiffs filed with the Court demonstrating that Defendants tendered a check in full payment of the alleged wages owed, as well as the IMWL penalty. Defendants contend that Plaintiffs are therefore not entitled to a judgment on the credit card offset fee wage claim itself because those issues are moot. *See* **Dkt. Nos. 292, 293, 295.**

## II. LIQUIDATED DAMAGES CLAIM AS
## TO CREDIT CARD OFFSET FEE POLICY

### A. Summary

The FLSA provides an exception under 29 U.S.C. § 260 for imposition of bad faith liquidated damages:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act ... the court may, in its sound discretion award no liquidated damages or award any amount thereof not to exceed the amount specified in Section 216 of this Title.

The summary judgment evidence demonstrates that PSI has proven its compliance with this statutory exception in connection with the credit card offset fee policy. It therefore contends that this Court should:

(a) grant judgment for PSI on the FLSA good faith issue; and

(b) rule that Plaintiffs who worked as servers at PSI between its opening in November 2013 and the termination of the credit card offset fee policy in early October 2014 are not entitled to be compensated under the FLSA beyond the base wage differential that may have accrued during the time in question.

### B. Introduction

PSI's restaurant opened in Oak Brook, Illinois, on or about November 13, 2013. *See* **Fact Statement ¶ 22.** The essence of the pending credit card offset fee claim is that because servers wanted to have their credit card tips converted to cash and paid out every night, PSI acquiesced to such a request. To defray the cost to PSI of providing such instant payment (instead of through a weekly or bi-weekly paycheck), PSI assessed a 3.25% fee on such credit card tips.[3] Plaintiffs concede that there is no factual dispute that PSI terminated this policy in mid-October

---

[3] Thus, for illustrative purposes only, if a server had generated $100 in credit card tips by the end of a nightly shift, PSI would pay that server a net credit card tip of $96.75 in cash when converting such tips to cash ($100.00 minus $3.25). *See* **Fact Statement ¶ 7**.

2014. *See* Plaintiffs' Fourth Amended Complaint, **Dkt. No. 121** at p. 10, ¶¶53-54. The Court can take judicial notice that such termination occurred prior to the filing of the instant lawsuit on or about October 30, 2014. *See* **Dkt. No.** 1.

Eligible class members (i.e., those who worked for PSI as servers at some point between November 13, 2013, and mid-October 2014) now seek to recover the salary differential between the "tip credit" wage of $4.95 per hour and the "minimum wage" of $8.25 per hour (that is, $3.30 per hour) for every hour they worked as a server. Plaintiffs assert not only that this policy was unlawful but also that it was imposed in bad faith.

### C. Prior Litigation Involving this Policy

As has previously been represented to the Court, PSI's parent entity, Perry's Restaurants, Ltd., formerly known as Leasing Enterprises, Ltd. ("PRL"), has repeatedly litigated the issue of the legality of its credit card offset fee policy. *See, e.g., Steele v. Leasing Enterprises, Ltd.*, Civil Action No. H-09-02789, 2015 WL 10438848 (S.D. Tex. 2015) ("Houston Lawsuit"), *aff'd*, 826 F.3d 237, 248 (5th Cir. 2016); *Hoenninger v. LEL*, 1:14-CV-798-LY (W.D. Tex.) ("Austin Lawsuit").

The District Court in the Houston Lawsuit ruled in August 2014 (after a 2013 trial) that the policy in question was not adopted in bad faith or willfully. *See* **Fact Statement ¶¶ 19-20**. The United States Court of Appeals for the Fifth Circuit affirmed this ruling. 826 F.3d at 248; *see* **Fact Statement ¶ 29**. In the Austin Lawsuit, the District Court conducted a trial on the issues of willfulness and bad faith as to this policy in October, 2017. *See* **Fact Statement ¶ 31**. It then issued Findings of Fact and Conclusions of Law in May 2018 holding that the policy was not imposed or applied in bad faith or willfully. *Id*.

As these prior courts have determined, PRL did not violate the FLSA in bad faith by its

4

use of the credit card offset fee policy. The evidence submitted in conjunction with this Memorandum supports that determination under Rule 56.

### D. FACTUAL BACKGROUND

#### 1. Origin of the Credit Card Offset Fee Policy

PRL servers requested to have their credit card tips cashed out on a nightly basis rather than having to await receipt of such compensation through bi-weekly paychecks. PRL complied with that request. *Steele*, 826 F.3d at 241. In order to comply, PRL established a procedure for paying servers their credit card-based tips in cash each night. *See* **Fact Statement ¶5**.

Mark Collins then served as PRL's Chief Operating Officer. *See* **Fact Statement ¶ 2**. Mr. Collins analyzed the process of nightly cashing out of credit card tips to determine the costs to PRL of converting a server's credit card tips to cash on the spot, at the end of each shift. *See* **Fact Statement ¶ 6**. Based upon this analysis, he determined that 3.25% was an appropriate offset percentage. *See* **Fact Statement ¶ 7**. The 3.25% offset deduction was calculated to include the cost of converting credit cards to cash, including credit card expenses directly allocable to charged tips, cost to obtain substantial amounts of cash needed to pay charged tips daily, and other liquidation-related costs. *Id*. When PRL instituted the offset, its leadership believed that such offset would not cover anticipated conversion costs but would only reduce the deficit incurred to acquiesce to servers' demand for a nightly cash out. *See* **Fact Statement ¶ 8**.

#### 2. Review of Credit Card Offset Fee Policy by Department of Labor

In 2004, the United States Department of Labor ("DOL") conducted an investigation of other aspects of PRL servers' compensation (such as charging servers for pepper mills and vests). *See* **Fact Statement ¶ 9**. This investigation was not related to the credit card offset fee policy. *See* **Fact Statement ¶ 10**.

At the conclusion of the investigation, Mr. Collins met with a DOL Investigator to review and discuss all of PRL's procedures, including its credit card offset fee policy. Mr. Collins was then informed that after reviewing the policy, the Investigator considered that PRL's handling of its tip pool and credit card tip offset practices were in order. *See* **Fact Statements ¶¶ 11**, **12**.

In addition to Mr. Collins's testimony, there is the testimony of Richard Henderson, who worked with Mr. Collins and who became the successor Chief Operating Officer. *See* **Fact Statement ¶ 3**. Mr. Henderson testified in the Houston Lawsuit that he "remembered there being a feeling that [PRL] wanted to go forward [with the offset] knowing that [it] was in compliance" with the FLSA. *See* **Fact Statement ¶ 14**. Additionally, Mr. Henderson verified that he worked closely with Mr. Collins during the time of the 2004 DOL investigation and that, following Mr. Collins's meeting with the DOL Investigator, "the takeaway was very clear" that the credit card offset policy complied with the law, and PRL felt "buoyed" by the review and approval of the offset policy. *See* **Fact Statement ¶ 15**. As Mr. Henderson also pointed out, the DOL investigated PRL in 2006 in connection with an issue of unpaid overtime to certain employees who happened to work at more than one PRL location during a payroll period. Like the 2004 investigation, this investigation had nothing to do with the credit card offset fee policy. *See* **Fact Statement ¶ 16**.

### 3. First Challenge to the Policy: The Houston Lawsuit

The legality of the credit card offset fee policy was challenged for the first time in the Houston Lawsuit, which was filed in August 2009. *See* **Fact Statement ¶ 17**.

### a. 2010 Interlocutory Ruling

The Houston Court issued an interlocutory ruling in August 2010 as to the legitimacy of certain cost components of the policy. *See* **Fact Statement ¶ 18**. Plaintiffs apparently intend to

claim in this case that because PRL maintained the credit card offset fee policy thereafter, it should be liable for a bad faith violation of the FLSA on that basis alone.

Plaintiffs' counsel conducted the deposition of Mr. Henderson in February 2018. She asserted at that time that this ruling was a declaration by the Houston Court that it deemed illegal the credit card offset fee policy in total. *See* **Fact Statement ¶ 18** & **Fact Statement n. 5**. In reality, that ruling solely identified what the Court considered at the time to be legitimate costs/expenses incurred by PRL that went to be evaluated in computing appropriate expenses to determine the legality of the policy. *See* **Fact Statement ¶ n. 5**.

The Houston Court deemed this assertion to be a legal nullity, and the Fifth Circuit agreed. *See* **Fact Statement ¶ 21**.

### b. Findings by the Houston Court

After a bench trial, the Houston Court on August 19, 2014, issued its original findings of fact and conclusions of law, ruling that PRL was liable for unpaid minimum wages under the FLSA because of the credit card offset fee policy, and also ruling that PRL acted in *good faith* and not *willfully* in establishing and maintaining the policy. *See* **Fact Statement ¶ 19; Exhibit "E," Houston Findings at p. 3** ("Because the Department of Labor's investigations of Perry's in 2004 and 2006 were not about credit fees, they do not show Perry's knew or recklessly disregarded the illegality of its 3.25% fee.")

### c. Termination of the Policy

In light of the Houston Court's August 19, 2014, ruling, PRL and PSI[4] immediately took steps to eliminate the credit card offset fees altogether. *See* **Fact Statement ¶ 25**. Thus, PSI: (a) eliminated the credit card offset fee; (b) eliminated the nightly cashing out of credit card tips

---

[4] PSI had opened for business in November 2013. *See* **Fact Statement ¶ 22**.

7

for servers, (c) reorganized its payroll system from a bi-weekly to a weekly structure with corresponding modifications to report all tips/server income on payroll checks; and (d) notified servers of the immediate change in policy. *Id*. PSI servers were timely notified in the latter part of September 2014 that the policy was being terminated and the payroll process changed. *Id*.; *see* Exhibit "G" (signed Acknowledgements about termination of policy from PSI Claimants, dated on or about September 19, 2014). Acknowledgements such as these were obtained from all servers then working for PSI to ensure awareness of the impending payroll process changes, coupled with the termination of the nightly cashing out of credit card tips. *See* **Fact Statement ¶ 27**. Termination of the policy and notification to servers was fully effective during the second week of October 2014 because, given the comprehensive nature and breadth of the change wrought by the Houston Findings, it took PRL approximately 5-6 weeks to eliminate the policy and convert to payment of credit card tips solely through regular paychecks. *See* **Fact Statement ¶ 28**.[5]

PSI never again after mid-October 2014 conducted any nightly cashing out of servers' credit card tips, and never again charged any servers any credit card offset fee concerning such tips. Instead, each server received a weekly payroll check reflecting without offset all credit card tips earned by each server during that payroll period. *See* **Fact Statement ¶ 28**.

Further, since the change in policy, no server has ever had credit card tips cashed out on a nightly basis, nor has any PSI server ever been subjected to any credit card offset fee deducted

---

[5] It is anticipated that Plaintiffs may assert that PSI should be liable for a bad faith violation for the six week time period between the August 19, 2014, Order in the Houston Lawsuit and the cessation of the policy in mid-October. It should not be overlooked that elimination of such a policy and its companion impact upon PSI's payroll system was a complicated process. *See* **Fact Statement ¶ 26**. As explained in more detail below, *see* Part III.D.5, the Austin Court (for the Western District of Texas) was presented with this identical contention in the Austin Lawsuit. The Austin Court held that having the policy in effect during this transitional period did not constitute a bad faith violation of the FLSA. *See* **Fact Statement ¶ 39** and **Fact Statement n. 8**.

from such tips. No server has ever made known to PSI management any document indicating either that the credit card offset fee policy was continued after the early part of October 2014, or that nightly cashing out of credit card tips continued after that time. *See* **Fact Statement ¶ 28**.

### 4. Further Challenge to the Policy: Appeal to the Fifth Circuit

As indicated above, the judgment in the Houston Lawsuit on FLSA liability was appealed by PRL (and cross-appealed by the *Steele* Plaintiffs as to the findings of no willfulness and no bad faith). *See* **Fact Statement ¶ 29**. The *Steele* Court **upheld the District Court's determination of no willfulness and no bad faith**. *See Steele*, 826 F.3d at 248-49.

The *Steele* Court discussed the trial evidence in detail and upheld the District Court's determination that PRL had operated the policy in reliance upon the verification it had received from the U.S. Department of Labor. The *Steele* Court **further noted the unsettled state of the law at the time the policy was in effect**. *Id.* at 247. As that Court reinforced, therefore, the ambiguity or complexity surrounding the credit card offset process can serve as reasonable grounds for an employer's good faith but erroneous belief that it was complying with FLSA requirements. *Id.* (citing *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 466 (D.C. Cir. 1976), *abrogated on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988) ("[A]mbiguous or complex legal requirements may provide reasonable grounds for an employer's good faith but erroneous belief that he is in conformity with the Act.").

### 5. Further Challenge to the Policy's Good Faith: The Austin Lawsuit

On October 23, 2017, the Austin Court conducted a bench trial on the issues of willfulness and bad faith regarding PRL's use of the credit card offset fee policy. *See* **Fact Statement ¶ 31**. The Austin Court then issued the Austin Findings, which reiterated that the credit card offset fee policy was not utilized willfully or in bad faith. *Id.*

## E.  CONCLUSION

The evidence establishes that PSI acted in good faith with respect to its credit card offset fee policy.  Accordingly, Plaintiffs are not entitled to recover liquidated damages as to that claim.

## III.  THE SIDEWORK CLAIM

### A.  INTRODUCTION

The term "sidework" in this context refers to work that Plaintiffs claim they were required to work as servers that fit into two categories:  (a) work that was outside of the scope of their tipped occupation as servers; and (b) work within the scope of their tipped occupation as servers.[6]  *See* **Fact Statement ¶ 36**.

When Plaintiffs worked as servers, they were compensated by being paid a base wage of $4.95 per hour for each hour worked, plus their tips (net of contributions to a tip pool for the benefit of bussers, food runners, waitresses and bartenders).  *See* **Fact Statement ¶ 35**.

It is undisputed that these servers never regularly performed work that was outside the scope of their tipped occupation as servers.  *See* **Fact Statement ¶ 36**.  As for sidework that they performed which was within the scope of their tipped occupation, they claim that that they spent a substantial amount of time, in excess of 20% of their workweek, performing such "sidework." *See* Complaint at p. 20, ¶117.[7]

### B.  ELIMINATION OF THE 80/20 SIDEWORK CLAIM

#### 1. Department of Labor Has Eliminated This Claim

PSI contends as a matter of law that Plaintiffs' sidework claim has been pre-empted by elimination of the "80/20" Rule by the United States Department of Labor ("DOL") in accord-

---

[6] The specific duties demarked as within the scope of work of a server's tipped occupation are identified in more detail in Part IV.B.2., *infra*.

[7] The "20%" demarcation has been referred to as the "80/20" Rule.

ance with the mandate established by its November 8, 2018 Opinion Letter (the "2018 Opinion Letter"). *See* **Fact Statement ¶ 39**.[8]

The initial appearance of the "80/20" Rule was designed to clarify the so-called DOL Field Operations Handbook Section 30d00(e) (the "FOH"). That Handbook contained an interpretation of the regulation at 29 C.F.R. § 531.56(e) (the "Regulation") which interpreted the definition of a "tipped employee." *See* 29 U.S.C. § 203(t); **Fact Statement ¶ 40**.

The 2018 Opinion Letter recites that the DOL has issued it to clarify confusion that was caused by the FOH, given the DOL's observation that courts were not consistently applying the FOH in light of the regulation. *See* **Fact Statement ¶ 41**. Specifically, the DOL expressed in the 2018 Opinion Letter its concern that the FOH had been construed to prohibit the taking of a tip credit for duties related to the tip producing occupation that exceeded 20 percent of the employee's work time. *See* **Fact Statement ¶ 42**. The 2018 Opinion Letter clarifies that the DOL has never intended to limit the amount of duties that servers perform that are related to their tip-producing occupation, and thus issued this guidance to define what specific duties are related to a tip producing occupation and, thus, not subject to the 80/20 rule. *See* **Fact Statement ¶ 43**.

### 2. Duties Now Excluded From Extra Compensation

The Opinion Letter provides the DOL's guidance with respect to what constitutes side-work that is no longer subject to the 80/20 Rule. *See* **Fact Statement ¶ 44**. According to the DOL, the following server tasks are related to a server's tip duties and therefore do not constitute side work:

    (1)    Take orders from patrons for food or beverages;
    (2)    Check with customers to ensure that they are enjoying their meals and take action to correct any problems;
    (3)    Check patrons' identification to ensure that they meet minimum age requirements

---

[8] The Opinion Letter is attached as Exhibit "J."

|     |     |
| --- | --- |
|     | for consumption of alcoholic beverages; |
| (4) | Collect payments from customers; |
| (5) | Write patrons' food orders on order slips, memorize orders, or enter orders into computers for transmittal to kitchen staff; |
| (6) | Prepare checks that itemize and total meal costs and sales taxes; |
| (7) | Present menus to patrons and answer questions about menu items, making recommendations upon request; |
| (8) | Remove dishes and glasses from tables or counters and take them to kitchen for cleaning; |
| (9) | Serve food or beverages to patrons, and prepare or serve specialty dishes at tables as required; |
| (10) | Clean tables or counters after patrons have finished dining; |
| (11) | Prepare tables for meals, including setting up items such as linens, silverware, and glassware; |
| (12) | Explain how various menu items are prepared, describing ingredients and cooking methods; |
| (13) | Assist host or hostess by answering phones to take reservations or to-go orders, and by greeting, seating, and thanking guests; |
| (14) | Escort customers to their tables; |
| (15) | Perform cleaning duties, such as sweeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and cleaning bathroom; |
| (16) | Inform customers of daily specials; |
| (17) | Prepare hot, cold, and mixed drinks for patrons, and chill bottles of wine; |
| (18) | Roll silverware, set up food stations, or set up dining areas to prepare for the next shift or for large parties; |
| (19) | Stock service areas with supplies such as coffee, food, tableware, and linens; |
| (20) | Bring wine selections to tables with appropriate glasses, and pour the wines for customers; |
| (21) | Fill salt, pepper, sugar, cream, condiment, and napkin containers; |
| (22) | Describe and recommend wines to customers; |
| (23) | Perform food preparation duties such as preparing salads, appetizers, and cold dishes, portioning desserts, and brewing coffee; and |
| (24) | Provide guests with information about local areas, including giving directions; and |
| (25) | Garnish and decorate dishes in preparation for serving. |

*See Fact Statement ¶ 44*.

The 2018 Opinion Letter makes clear that as to duties such as those enumerated above, there is no limitation that can be placed on the amount of these duties that may be performed, whether or not they involve direct customer service, as long as they are performed contemporaneously with the duties involving direct service to customers or for a reasonable time immediately before or after performing such direct-service duties. *See* **Fact Statement ¶ 46**.

The 2018 Opinion Letter further makes clear that it supersedes statements in the FOH, including the rule that the performance of side work is a violation of the FLSA when an employee spends in excess of 20 percent of his or her time performing general preparation or maintenance work. *See* **Fact Statement ¶ 47**; *see* Exhibit "J" at p. 3.

Thus, the server-related duties listed in the above are no longer subject to an "80/20" Rule, but are considered by the DOL to be adequately compensated through tip compensation. *See* **Fact Statement ¶ 48**.

### 3. Plaintiffs Only Performed Sidework Related to Their Tipped Occupation

On July 9, 2018, Magistrate Judge Finnegan directed Plaintiffs' counsel to identify no more than nine (9) other as trial witnesses. *See* ***Dkt. No.*** **272**. Plaintiffs' counsel provided such a designation to undersigned counsel, and undersigned counsel then conducted the depositions of each of those nine (9) witnesses. When questioned at their respective depositions, each of these Plaintiffs admitted that their sidework claim was predicated entirely upon duties pertaining to their tipped occupation, *see* **Fact Statement ¶ 37, 38**, and that they were never required by PSI to perform duties such as cooking meals, taking out the trash, cleaning out toilets, or the like. *See* **Fact Statement ¶ 36**.

### 4. The 2018 Opinion Letter Controls the Sidework Claim

Thus, the server-related duties listed above are no longer subject to an "80/20" Rule, but are considered by the DOL to be adequately compensated through tip compensation. In light of the 2018 Opinion Letter, Plaintiffs' claims for "side work" are no longer contingent upon the 80/20 rule outlined in the superseded FOH. Likewise, many of the "duties" Plaintiffs claim constituted side work have been deemed by the DOL as duties that are "related" to a servers duties.

The 2018 Opinion Letter provides the clearest picture of the DOL's intent for how the

Regulation should be applied to Plaintiffs' side work claim. Its impact upon this case is dictated by the decision of the United States Supreme Court in *Auer v. Robbins*, 519 U.S. 452 (1997). The *Auer* case involved a FLSA claim for unpaid overtime subject to 29 U.S.C. §213. The DOL had interpreted the applicable statutory standards to classify the employees involved in the case as "exempt" and, thus, ineligible for overtime pay. The Supreme Court held that the determination by the DOL in that case was reasonable and had to be sustained because of the broad grant of authority contained in the FLSA, and because the DOL's approach was based upon a permissible construction of the FLSA. *Auer*, 519 U.S. at 456-57.

The focal point of *Auer* was the salary basis test, and its interpretation by the DOL. The Supreme Court noted that because this "test" was a creature of the DOL's own regulations, they concluded that its interpretation of this test was controlling unless plainly erroneous or inconsistent with the regulation. *Auer*, 519 U.S. at 461 *citing Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989).

The standards concerning compensable sidework have likewise been created by the DOL in its regulations and in its FOH. Under *Auer*, the interpretation set forth in the 2018 Opinion Letter should therefore be deemed to be controlling.

When the DOL issues an opinion letter interpreting a regulation after the filing of a lawsuit, but before the final resolution of the suit, then the opinion letter still carries considerable weight in the interpretation of the regulation in the lawsuit. *See Acs v. Detroit Edison Co.*, 444 F.3d 763, 768 (6th Cir. 2006). In *Detroit Edison Co.*, plaintiffs filed a complaint against their employer seeking time and a half compensation under the FLSA. *Id*. at 766. In May 2003, the district court determined that the employer guaranteed the plaintiffs a "predetermined amount" within the meaning of the applicable regulation, 29 C.F.R. § 541.118, but concluded that short-

falls in pay based on under-reporting of hours constituted an unlawful docking under that regulation. *Id*. at 767. A few months after the district court made this ruling, the DOL issued an opinion letter stating that shortfalls in employee pay, based on under-reporting of hours, did not amount to unlawful docking. *Id*. Reasoning that the opinion letter permissibly interpreted the DOL's own regulation, the district court granted a new motion for summary disposition reversing its prior holding. *Id*. The Sixth Circuit affirmed the district court's application of the opinion letter as it recognized the Secretary's authority to interpret her own regulation. *Id*. at 768-70.

Here, the 2018 Opinion Letter squarely addresses how the Regulation should be applied to the Plaintiffs' claims, and should control the outcome of Plaintiffs' sidework claim because without question, it provides the most recent and most straightforward guidance as to how the FLSA regulation concerning "dual jobs" is to be applied.

This Opinion Letter therefore casts in a new light the Seventh Circuit's prior assessment of compensation for dual jobs. *See Schaefer v. Walker Bros. Enters*., 829 F.3d 551, 553 (7th Cir. 2016). In *Schaefer*, the plaintiffs brought a claim against their employer contending, in part, that they engaged in "dual jobs" for which they were not adequately compensated. The *Schaefer* Court decided that the employer did violate the FLSA for not compensating servers for "related" duties. That Court looked directly to the FOH for guidance in interpreting the regulation. *Id*. at 554. Indeed, that Court noted the FOH was entitled to deference. *Id*. Without the benefit of the 2018 Opinion Letter, the Court, like many other courts around the country, was left to speculate as to what server duties were "related" or "unrelated" to tipped work.

Since the principal purpose for the 2018 Opinion Letter is to provide guidance to Courts as to what server duties were "related" and "unrelated" to tipped work, this Court should credit that most recent pronouncement.

15

As demonstrated herein, the duties at issue in this case all are properly categorized as duties related to servers' tipped occupation. Accordingly, Plaintiffs' claim for unpaid sidework should be dismissed.

## IV. TIP POOL CLAIM

### A. INTRODUCTION

Plaintiffs contend that the way in which PSI handled the tip pool violated the FLSA. The tip pool structure established by PSI involved calculating 4.5% of a server's sales during nightly checkouts, and then designating that amount as the server's "tip share" contribution. *See* **Fact Statement ¶¶ 55, 49-51**. Individual employees who were not tipped employees, such as bussers, food runners, hostesses and bartenders, were guaranteed a certain hourly minimum wage for perform their duties, for example, $12.00 per hour. *See* **Fact Statement ¶ 53**. The tip pool system was designed to reward these members of the "support staff" for their efforts in assisting servers as part of a team to provide service to PSI's customers. *See* **Fact Statement ¶ 54.**

### B. NATURE OF PLAINTIFFS' CLAIM

In essence, as reiterated by various claimants, they premise their tip pool claim upon the following syllogism:

(a) Servers earned fluctuating amounts in tips each week;

(b) Certain bussers and runners were telling them that the pay for bussers and runners was a fixed amount;

(c) Therefore, a difference existed between the tip amount contributed to the tip pool and the tip amount distributed to eligible tip pool recipients; and

(d) Since this "difference" was not distributed to the tip pool participants, it had to have been retained by PSI.

Upon conducting depositions of the named Plaintiffs and the designated trial witnesses, PSI ascertained that Plaintiffs had no admissible evidence of any kind to substantiate that PSI

16

had kept tip pool contributions "for the house" rather than distribute such contributions to eligible tip pool participants. *See* **Fact Statement ¶ 60**.

### C. PROPER HANDLING OF THE TIP POOL

This syllogism does not stand up to scrutiny.

Plaintiffs' own witnesses and documentation demonstrate that tip pool participants were the beneficiaries of extra compensation over and above any guaranteed weekly wage in those situations where tip pool contributions provided funding for payment of such additional amounts. *See* **Fact Statement ¶¶ 60, 62-65.** *See* Exhibits "**M**" and "**N-3**."[9]

These documents demonstrate conclusively that while these persons were working at PSI as tip pool participants (either as a food runner or as a hostess), they received fluctuating weekly compensation above their guaranteed minimum wage depending upon whether and the extent to which there was additional money from tip pool contributors (the servers) to distribute such fluctuating compensation. *See* **Fact Statement ¶¶ 60, 65**.

### D. CONCLUSION

Thus, there is no genuine issue of material fact that PSI properly administered the tip pool and that it did not retain any portion of the tip pool proceeds impermissibly. As a matter of law, therefore, it cannot be held to have violated the FLSA by its tip pool policy.

## V. NOTICE CLAIM

Plaintiffs also contend in their lawsuit that they were not provided proper notice of the details of the tip pool structure described above. However, this claim cannot stand under the weight of the evidence.

---

[9] Plaintiffs produced pay stubs from a PSI food runner named Jose Murillo. *See* **Exhibit "M," at pp. 1-11**. Plaintiffs also verified paychecks issued to one of Plaintiffs' designated trial witnesses, Rosario De Leon Gonzales. *See* Exhibit "**N-3**."

17

Servers were provided notice of how the tip share process was going to work. *See* **Fact Statement ¶ 67**. In addition to that, servers all acknowledged that PSI posted signs concerning the requirements of federal and Illinois laws concerning payment of wages, including server compensation through the tip credit. *See* **Fact Statement ¶ 68**. Finally, Plaintiffs admitted that on their very first day of employment, they were provided precise information about the nature and extent of the tip share structure and procedure. *See* **Fact Statement ¶ 69**. These Plaintiffs verified that the documentation attached to their respective depositions was a true copy of such nightly checkout forms, and provided them with the information identified herein. *See* **Fact Statement ¶¶ 70-73**.

Regarding the notice component of the FLSA, the United States Court of Appeals for the Seventh Circuit has eschewed the application of a rigid notice regime in favor of a practical approach to assessing an employer's complying with FLSA notice requirements. *Schaefer*, 829 F.3d at 556. The *Schaefer* Court declared that precise notice requirements were not necessary, and that an employer could satisfy its FLSA notice obligations as long as it informed its employees of the following: (a) the tips the employer will pay less than the minimum wage; (b) how much the cash wage will fall short of the current minimum wage; and (c) if tips plus the cash wage do not at least match the current minimum wage, the employer must make up the difference." *Id*. at 556-7.

The evidence demonstrates that there is no genuine issue of material fact that Plaintiffs' notice claim must fail because, under the applicable standard, all of the plaintiffs duly received the legally required notices.

## VI. COMMON LAW CLAIMS

Plaintiffs also seek recovery under Illinois law for breach of contract and for unjust en-

richment. *See* Complaint, ¶¶ 4-6, 189-214 at pp. 3-5, 29-33. Such claims are premised upon the same "unpaid wage" mantra invoked to support Plaintiffs' FLSA claims.

Several courts in this Circuit have held that such state common law claims are pre-empted by the FLSA. *See Farmer v. DirectSat USA, LLC*, No. 08-3962, 2010 WL 3927640 (N.D. Ill. Oct. 4, 2010) *citing Nicholson v. UTI Worldwide, Inc.*, No. 3:09-cv-722-JPG-DGW, 2010 WL 551551 (S.D. Ill. Feb. 12, 2010); *Sorensen v. CHT Corp.*, No. 03 1609, 2004 WL 442638 (N.D. Ill. March 10, 2004); *Morgan v. SpeakEasy, LLC*, 625 F. Supp. 2d 632, 659-60 (N.D. Ill. 2007)

As Plaintiffs' claims arise under the same set of facts alleged in support of the FLSA claims asserted herein, PSI contends that these claims are all pre-empted as a matter of law.

## VII. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, DEFENDANTS PERRY'S STEAK-HOUSE OF ILLINOIS, L.L.C., HOWARD CORTES and JEFFREY PAGNOTTA respectfully request that this Court enter summary judgment in their favor and against Plaintiffs on all of the claims enumerated above and in their Rule 56 Motion, and that the Court further grant such additional relief as it deems to be just and proper.

Dated: February 12th 2019.

            PERRY'S STEAKHOUSE OF ILLINOIS,
            L.L.C., HOWARD CORTES and JEFFREY
            PAGNOTTA
            By:   */s/ Lionel M. Schooler*
                    One of its Attorneys

Lionel Schooler (Pro Hac Vice) (lschooler@jw.com)
**Jackson Walker L.L.P.**
1401 McKinney Suite 1900
Houston, TX 77010
713/752-4516

Joseph M. Gagliardo (901989) (jgagliardo@lanermuchin.com)
Jeffrey S. Fowler (6205659) (jfowler@lanermuchin.com)
Laner Muchin, Ltd.
515 North State Street, Suite 2800
Chicago, Illinois 60654
312/467-9800

**CERTIFICATE OF SERVICE**

I, Lionel M. Schooler, an attorney, hereby certify that on February 12, 2019, I caused to be served a copy of the foregoing Memorandum of Law in Support of its Motion for Partial Summary Judgment in the above-captioned matter to be filed with the Clerk of the District Court and served on the parties of record, including those listed below, by operation of the Court's CM/ECF electronic filing system, and by electronic mail, addressed to: Colleen M. McLaughlin (colleen@cmmc-employmentlaw.com), Law Offices of Colleen M. McLaughlin, 1751 S. Naperville Rd., Ste. 209, Wheaton, Illinois 60187.

*/s/ Lionel M. Schooler*
Lionel M. Schooler