IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA BERGER, TIMOTHY RENDAK and PATRICK MCCUMBER, on behalf of themselves and all other persons similarly situated, known or unknown, | § § § § § | |
| Plaintiffs, | § § | Case No: 1:14-cv-08543 |
| vs. | § § | Judge: Thomas M. Durkin |
| PERRY'S STEAKHOUSE OF ILLINOIS, LLC., D/B/A PERRY'S STEAKHOUSE AND GRILLE, HOWARD CORTES and JEFFREY PAGNOTTA, | § § § § § | Magistrate Judge: Sheila Finnegan |
| Defendants. | § | TRIAL BY JURY DEMANDED |

## DEFENDANTS' L.R. 56.1(B)(3)(B) AND (C) RESPONSE TO PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

DEFENDANTS, PERRY'S STEAKHOUSE OF ILLINOIS, LLC., D/B/A PERRY'S STEAKHOUSE AND GRILLE, HOWARD CORTES and JEFFREY PAGNOTTA ("PSI" or "Defendants") respond pursuant to Local Rule 56.1(B)(3)(B) and (C) to Plaintiffs' Rule 56.1 Statement of Material Facts ("Statement") as follows:[1]

## I. RESPONSES TO PLAINTIFFS' STATEMENTS[2]

1.     Perry's Steakhouse of Illinois ("PSI") operates the Perry's Steakhouse and Grille restaurant in Oak Brook, Illinois ("hereinafter referred to as "Perry's" or "Perry's Oakbrook"), which opened for business to the public in or around mid-November of 2013. Dkt. 305, Amended Answer to Fourth Amended Complaint ("Am. Ans. 4AC"), ¶16; Plaintiffs' Exh. 10.

---

[1] Defendants object to Plaintiffs' unnumbered headings as violating the local rules and as containing unsupported and insupportable allegations. For clarity, because these statements were not numbered, Defendants presume that Plaintiffs intended them merely as guideposts and not as substantive allegations to which responses were required. Defendants have therefore omitted them from this Response. To the extent the Court deems substantive responses to be required, Defendants deny the allegations in the headings to the extent that they are inconsistent with properly supported factual statements.

[2] Defendants are including "Additional Fact Statements" as needed in Part II. of this pleading.

RESPONSE: Defendants admit the allegations in this Statement.

2. PSI is a wholly owned subsidiary of Perry's Restaurants Limited, ("PRL") which is a limited partnership based in Texas. PRL was formerly known as Leasing Enterprises and is the parent company for all Perry's Steakhouse and Grille Restaurants, located in Texas, Illinois, Colorado, and Alabama. Dkt. 305, ¶¶ 17-19; FRCP 30 (b)(6) Deposition of Richard Henderson at 9:9-10:6. ("30 (b)(6) Dep."); Plaintiffs' Exh. 6.

RESPONSE: Defendants admit the allegations in this Statement.

3. PSI's corporate office is the same as PRL's corporate office which is located in Houston, Texas. 30 (b)(6) Dep. at 10:19-21. PSI's "headquarters" is staffed exclusively by PRL employees and all corporate management of PSI is conducted through PRL employees from PRL's headquarters in Texas. 30 (b)(6) Dep. at 12:10-25.

RESPONSE: Defendants admit the allegations in this Statement.

4. Perry's Oakbrook is operated in the same manner as all other Perry's restaurants. Deposition of Howard Cortes at 111:13-16 ("HC Dep."); Plaintiffs' Exh. 5. Most administrative functions for PSI are done by or run through PRL; for example, PSI's Human Resources Department is PRL's Human Resources Department. 30 (b)(6) Dep. at 10:22-11:11; HC Dep. at 94:18-20. Employees at Perry's Oakbrook are paid using the same payroll methods as with other Perry's restaurants and is handled by corporate headquarters in Houston, Texas. HC Dep. at 77:13-20, 105:21-106:3, 107:4-6; 30 (b)(6) Dep. at 10:22-11:1; Defendant Howard Cortes' Revised Responses and Objections to Plaintiffs' First Set of Merit Interrogatories at 8,9 ("HC Ans. to Rogs."); Plaintiffs' Exh. 12. As for processing payment of credit card tips, PSI uses the same policy in Illinois that was used in PRL, in Texas. HC Dep. at 97:8-19.

RESPONSE: Defendants admit the allegations in this Statement.

5. Defendants' FRCP 30 (b)(6) Deponent, Richard Henderson ("Henderson"), has been employed by PRL since 2002 and has been PRL's Chief Operating Officer ("COO") since the fall of 2009, taking over for former COO Mark Collins ("Collins"). 30 (b)(6) Dep. at 8:1-23, 57:3-4. As COO, Henderson is responsible for the oversight of all Perry's Steakhouse and Grille Restaurants, including PSI. 30 (b)(6) Dep. at 9:13-19, 15:13-17. As PSI's corporate representative, Henderson did not rely upon any documents that were specific to PSI in his deposition. 30 (b)(6) Dep. at 23:15-24:5.

RESPONSE: Defendants admit the allegations in this Statement.

6. Defendant Howard Cortes ("Cortes") worked for PRL at various Perry's Steakhouse and Grille locations in Texas before moving to Chicago in July of 2013 to open and become Perry's Oakbrook's General Manager ("GM"). HC Dep. at 21:5-7, 22:6-11, 26:20-23, 36:19-25, 39:1-2, 97:20-24. Cortes held the position of GM during Perry's Oakbrook's first year of existence from November 2013 to October 2014. Dkt. 305 at ¶20-21; 30 (b)(6) Dep. at 27:18-20. From 2013 to 2014, Cortes was responsible for the day to day operations at Perry's, such as supervising employees, employee wage and hour classifications, employee compensation, timekeeping, and tip pool policies and procedures. HC Dep. at 25:22-26:6, 88:9-11, 95:19-24. Cortes also set work stations

and assigned "sidework." HC Dep. at 78:4-25, 80:19-20.

    RESPONSE: Defendants admit the allegations in this Statement.

7.    As GM of Perry's Oakbrook, Cortes reported to David Freeman, who is Director of Operations at PRL. HC Dep. at 35:11-36:19. Cortes operated the store at Perry's Oakbrook in the same manner he operated Perry's restaurants in Texas, i.e., there was no difference between the Texas stores and Perry's Oakbrook as to how employees were paid. HC Dep. at 77:3-25. In October of 2014, Cortes was promoted to PRL's Regional Manager, and, ultimately left PSI to return to Texas to oversee five Perry's locations. HC Dep. at 20:14-19, 65:23-66:5.

    RESPONSE: Defendants admit the allegations in this Statement.

8.    Defendant Jeffrey Pagnotta ("Pagnotta") worked at Perry's as a floor manager from the fall of 2013 through October 2014, when he took over as GM for Perry's and assumed Cortes's responsibilities. Deposition of Jefferey Pagnotta at 18:12-19:2 ("JP Dep."); Dkt. 305 at ¶6; Plaintiffs' Exh. 7. Pagnotta has a master's degree in Hospitality Management from Florida International University and has been working in the restaurant industry since 1996. JP Dep. at 16:10-15, 23:1-36:12. At Perry's Oakbrook, Pagnotta reports to Patrick Neimier, PRL's Regional Director for Illinois. JP Dep. at 16:22-17:12.

    RESPONSE: Defendants admit the allegations in this Statement.

9.    Class representatives, Jessica Berger and Timothy Rendak, are former servers at PSI and represent a Rule 23 class of 115 and opt-in FLSA collective of 29. 4 Servers Opted Out during the Notice Period and 4 Servers were involuntarily dismissed, leaving a total of 107 in the entire Class. [footnotes omitted]

    RESPONSE: Defendants admit the allegations in this Statement.

10.    Defendants are covered entities under the FLSA and the IMWL. Dkt. 305, 126, 158. Plaintiffs are tipped employees as defined by the FLSA and the IMWL. *Id.* at 123-125, 154-156.

    RESPONSE: Defendants admit the allegations in this Statement.

11.    Every Server at a Perry's Restaurant is a tipped employee as defined by 29 U.S.C. §§ 203 (m) and (t) and are paid at the applicable tipped credit rate. Dkt. 305 at ¶ 31. In Texas, Servers are paid at the federal tipped credit rate of $2.13 per hour. HC Dep. at 82:2-5. In Illinois, all Servers at Perry's Oakbrook are paid at the Illinois tip credit rate of $4.95 per hour. Dkt. 305, ¶¶ 70-74; HC Dep. at 79:22-80:7, 120:16.

    RESPONSE: Defendants admit the allegations in this Statement but the allegation relating to servers in Texas are not material because the alleged wage paid to any server outside of Illinois is not covered by this lawsuit, which is restricted to those servers who were employed by Perry's Oakbrook.

12.    Perry's Oakbrook was the first restaurant established by PRL outside of Texas. 30 (b)(6) Dep. at 28:16-25. As a first-time restaurant in a different state, PLR *[sic]* was unfamiliar with the

norms and practices of Illinois when it opened Perry's Oakbrook. 30 (b)(6) Dep. at 28:16-29:7. Cortes was responsible for opening Perry's Oakbrook, but did not receive any training on Illinois wage laws. HC Dep. at 38:23-25,111:13-19. However, in preparation to open Perry's Oakbrook, Cortes took it upon himself to research Illinois laws regarding minimum wage for tipped employees. Cortes was "proud" of himself for doing so. HC Dep. at 80:14-84:20. Other than checking the wage that tipped employees were to be paid, Cortes did nothing else to ensure that PSI was in compliance with the FLSA or other Illinois wage laws. HC Ans to Rogs., 10.

> RESPONSE: Defendants admit the allegations in this Statement with the exception of the last sentence. That sentence completely mis-characterizes Mr. Cortes' response to Interrogatory No. 10. The answer he gave stated as follows:
>
> > I ensured that all reports about employee activities were accurate for all employees, including servers. I then checked the information that had been entered into spreadsheets regarding such activity, because I wanted to make certain that all receipts and payouts matched correctly. If I found any errors, I required that these be corrected at the end of the shift or within one day, to ensure that all numbers entered matched the way they were supposed to, and that they were in order by the time the information was to be furnished to the payroll department for processing as described above.
>
> *See* Exhibit "CC."

13. Although Cortes claimed that he received training on various payroll policies regarding tipped employees, Cortes does not recall any training specific to the FLSA. In fact, Cortes admitted that he was not sure what the FLSA was, nor did he know what the term "tip credit" meant. HC Dep. 99:4-120:12; HC Ans. to Rogs., 6. Cortes never received any training on opening a store nor was he provided any training on wage and hour laws. HC Dep. 29: 2-33: 5. The only payroll training Cortes passed onto PSI's managers was how to submit payroll paperwork to headquarters on a nightly basis. HC Dep. at 29:2-11,32:23-33: 5. It was Cortes's understanding that the payroll process "complied with all legal requirements." HC Ans. to Rogs., 9.

> RESPONSE: Defendants admit the allegations in this Statement.

14. Perry's first servers were hired in September of 2013 and trained prior to the restaurant opening. 30 (b)(6) Dep. at 29:8-12. During his tenure as GM at Perry's Oakbrook, Cortes hired all servers. HC Dep. at 119:24-120:12; 30 (b)(6) Dep. at 27:18-20; HC Ans. to Rogs., 5. Cortes conducted training sessions for servers at a nearby hotel prior to the restaurant's opening. 30 (b)(6) Dep. at 29:13-14. Each server hired was provided an Employee Handbook and a Servers Development Guide ("Server's Guide") during their orientation training. 30 (b)(6) Dep. at29:17-19; HC Ans to Rogs., 5; Defendant Perry's Steakhouse of Illinois' Revised Responses and Objections to Plaintiffs' First Set of Merit Interrogatories at 7 ("PSI Ans. to Rogs."); Plaintiffs' Exh. 11. PSI slightly "tweaked" the training materials used by PRL for PSI. For example, Cortes adjusted food menu items discussed in the Server's Guide. 30(b)(6) Dep. at 30:319; HC Dep. at 92:22-93:17. Servers and bussers from Texas were also sent to Illinois by PRL to assist in training the new hires. HC Dep. at 187:10-189:2; Deposition of Guy Redding at 59:1215 ("GR Dep."), Plaintiffs' Exh. 50.

RESPONSE: Defendants admit the allegations in this Statement.

15.     For payroll purposes, employees are assigned "job codes." GR Dep. at 90:22-91:8. For example, servers in training would sign in as "trainee" and paid $8.25 per hour, the Illinois minimum wage rate. Deposition of Rosy Gonzalez at 38:23-39:23 ("RG Dep."), Plaintiffs' Exh. 56; see also Plaintiffs' Exh. 14, Perrys001656-1657,1669,1636. Servers who Perry's recognized as performing different jobs would sign in under a job code for what their function was for the shift. See Plaintiffs' Exh. 13; Perrys 1636, 1669. It is not difficult to switch between job codes. On slow nights, when a server was sent home early and did not get assigned a table for the entire night, the Manager would switch the job code for that server to "trainee" so he or she would be paid minimum wage of $8.25. RG Dep. at 93:21-94:7

RESPONSE: Except as noted below, Defendants admit the allegations in this Statement but they are not material because servers' claims in this case focus solely on those instances when they were paid $4.95 per hour plus tips, not $8.25 per hour. Defendants deny the allegations in this Statement concerning any job code classification by "servers who performed different jobs." Those individuals did sign in and, for example, if they were going to work that shift as a bartender, then PSI made the notation to ensure that that individual was paid a guaranteed wage, rather than being compensated primarily based upon voluntary gratuities. *See* **Exhibit "R-1" (Berger Dep. at pp. 55-56, 95); Exhibit "X-1" (Gonzales Dep. at pp. 23, 25, 39); Exhibit "W-1" (Rendak Dep. at pp. 25, 36, 77-78, 82).**

16.     Perry's uses an electronic Point of Sale ("POS") computer system called Aloha which, among other things, records employees' hours worked, credit card transactions, tips and gratuities, and all restaurant sales. Dkt. 305 at ¶41. When each Server checks out at the end of his/her shift, the Server makes sure that all information is entered into the POS system, including tips paid to the Server in cash. Dkt. 305 at ¶44. The POS system then generates a report (the "checkout report"). Perrys 003951-4169, Plaintiffs' Exh. 14. The Server then attaches a copy of all credit card receipts to the checkout report, reviews it and takes it to a manager or designee (usually a bartender) for review. HC Ans. to Rogs. at 1; HC Dep. at 98:6-15; Dkt. 305 at 52. This process was called the nightly "cash out" or "tip out." Dkt. 305 at 46. It doesn't matter if Perry's Servers are assigned to the main dining room or the cocktail area, the checkout process is identical. HC Ans. to Rogs., 1. Furthermore, earnings for cocktail area servers versus dining room servers are equivalent. RG Dep. at 87:18-88:6.

RESPONSE: Defendants admit the allegations in this Statement, with the exception of the last sentence. As shown in the referenced record, the information stated therein is merely the "opinion" of a fact witness, without any demonstrated foundation for such opinion, and is therefore inadmissible under FED.R.CIV.P. 56.    *See* FED.R.CIV.P. 56(c)(2).    As made clear by FED.R.CIV.P. 56(c)(4), testimony submitted pursuant to Rule 56 must be made on personal knowledge, and must "set out facts that would be admissible in evidence."

17.     From the time Perry's Oakbrook opened in November 2013 until mid-October 2014, it paid its Servers nightly in cash for all tips they received during their shift, including tips paid by credit or debit cards. HC Ans. to Rogs., 1; HC Dep. at 154: 5-14. Servers were paid their wages ($4.95/hr.), less standard withholding deductions on their wages and declared tips every two weeks by payroll check. HC Dep. at 79:21-80:4,154:10-155:12.

RESPONSE: Defendants admit the allegations in this Statement.

18.     From the time Perry's Oakbrook opened in mid-November 2013 until mid-October 2014, two deductions were taken by PSI from the cash tips the servers received on a nightly basis. First, the computer program would calculate and deduct 4.5% of total sales for the Server's Tip Pool or "Tip Share" contribution. HC Ans. to Rogs., 1. This is indicated on the Checkout Report as "Tip Share." See Plaintiffs' Exh. 15; Perrys 007699-7717; 30(b)(6) Exh. 1-5; indication 18a.[3] Support staff at Perry's, namely "hostesses, bussers, bartenders, and food runners" are all paid a "guaranteed" hourly wage through regular payroll checks. The support staff did not receive a nightly cash-out for their tips. HC Dep. at 157:1-163:10. Instead, their guaranteed hourly wage was made up of $4.95 per hour plus a percentage of the tip pool. *HC Ans. to Rogs., 8*. If the tip pool for the week is insufficient to meet the guaranteed hourly wage of these employees, Perry's pays the difference. If the Tip Pool funds are more than what is needed to pay the guaranteed hourly rate, PSI claims to distribute the overage to these tip pool recipients. HC Dep. at 100:4-15.

RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material because Plaintiffs are not seeking summary judgment concerning any matter related to the tip pool.

19.     The second deduction from the Server's nightly cash out of tips was a "Credit Card Offset Fee," which is referred to on the Check Out Report and the receipts turned in by Servers at the end of each shift as the "Tip Refund." 30 (b)(6) Dep. at 97: 15-25, Plaintiffs' Exh. 14; indication 19a; PSI Ans. to Rogs., 11. To recoup the additional expense involved with cashing out a server's credit card tips nightly, PRL's policy of deducting 3.25% from servers' credit card and debit card tips was implemented at PSI. 30 (b)(6) Dep. at 37:23-40:5; Dkt. 305 at 77.

RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are  not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014.  *See Dkt. Nos. 292, 293, 295; see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5)**.

20.     In or about 2003, PRL implemented, for all its Perry's restaurants in Texas, a policy of deducting from servers' tips 3.25% of their credit card tips to cover the costs associated with converting their credit card tips to cash on a nightly basis. Rick Henderson Affidavit filed in *Hoenninger v. Leasing Enterprises, Ltd*, l:14-cv-00798, Dkt. 171-2, filed on 5/19/17; 30(b)(6) Dep. Exh. 7, ("Henderson Aff.") at ¶4, attached hereto as Plaintiffs' Exh. 16; Mark Collins Affidavit filed in *Hoenninger* v. *Leasing Enterprises, Ltd,* l:14-cv-00798, Dkt. 171-1, filed on 5/19/17; 30(b)(6) Dep. Exh. 9, ("Collins Aff.") at 3, attached hereto as Plaintiffs' Exh. 17. [footnote omitted]

RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are  not properly before the court based upon the Defendants' payment of the back wages and

---

[3] As with this text in SOMF 18, there are several instances where the phrase "*indication 18a*" (or equivalent phrase referencing the specific Statement) is used in Plaintiffs' Rule 56.1 Statement.  This phrase does not appear to relate to any particular fact and Defendants are therefore ignoring it.

IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

21.     In 2009, PRL was sued in the U.S. District Court for the Southern District of Texas in a FLSA collective action, entitled *Steele* v, *Perry's Restaurant, LLC, el al.,* Case No. H-09- 2789, brought on behalf of all current and former Servers at Perry's Restaurants. The Fourth Amended complaint claimed that PRL had violated the FLSA by charging its servers the 3.25% offset fee. PRL was represented in this Texas case by Lionel Schooler of Jackson Walker. See, *Steele* v. *Leasing Enterprises,* 826 F.3d 237, 241 (5th Cir. 2016); Henderson Aff. at 12.

RESPONSE:  Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are  not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

22.     On August 31, 2010, the district court in the *Steele* case, entered a partial interlocutory judgment holding that PRL had violated the FLSA "because [the Credit Card Offset Fee] is sub-stantially higher than its reasonably direct cost to deal in credit. Because no credit company charges more than 2.9% and most charge closer to 2%, the 3.25% fee exceeds its direct credit fees." *Steele,* Case No. H-09-2789, Dkt No. 359, Findings of Fact and Conclusions of Law, 6, attached hereto as Plaintiffs' Exh. 18.

RESPONSE:  Defendants deny the allegations made in Paragraph 22.  *See* EXHIBIT CC.  The interlocutory and non-binding status of the August 2010 ruling was characterized as such by the Houston Court, *see* Exhibit "EE" (Amended Houston Findings at p. 4), and later verified by the United States Court of Appeals for the Fifth Circuit in its subsequent appellate review of the Houston Court's judgment.  826 F.3d at 248.

23.     A two-day bench trial was held in the *Steele* case on April 30 and May 2, 2013, and on August 20, 2014, the district court in *Steele* entered its initial Findings of Fact and Conclusions of Law. again holding that Perry's 3.25% offset fee violated the FLSA because the offset exceeded what Perry's paid as credit card issuer fees. Henderson Aff. at 12.

RESPONSE:  Defendants admit the allegations in this Statement but this Statement is not ma-terial to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are  not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

24.     PRL appealed the district court's decision to the 5th Circuit Court of Appeals. On June 14, 2016, the appellate court affirmed the District Court's finding that Perry's Credit Card Offset Fee violated the FLSA, thereby negating Perry's use of the Tip Credit rate and ruling that Perry's must pay its servers full minimum wage for all hours worked. *Steele* v. *Leasing Enterprises*, 826 F.3d

237, 246 (5ᵗʰ Cir. 2016).

> RESPONSE: Defendants admit the Fifth Circuit's ruling on liability concerning the base wages in issue, but deny that this Statement is correct because it is selective and incomplete. It makes no reference to the *Steele* Court's rulings affirming no bad faith and no willfulness by PRL regarding the credit card offset fee policy. Further, without waiving the foregoing, Defendants contend that this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

25.     Henderson testified as the corporate representative in the *Steele* case and is thoroughly familiar with the facts relating to the Credit Card Offset, or "Tip Refund Policy." 30 (b)(6) Dep. at 16:4-16, 20:5-8. Credit card company fees range from 1.57% to 2.9% for a typical transaction where the card number is swiped into the system electronically as opposed to manually, which could cost up to 3.23% for American Express. 30 (b)(6) Dep. at 46:7-23.

> RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

26.     In *Steele,* PRL argued that (1) Perry's should be allowed to recover its expenses because the servers had insisted on cash payments nightly and it was only fair that the servers share in the costs associated with the nightly cash-out conversion. (30 (b)(6) Dep. at 44: 9-14); (2) that credit card companies charged a number of different fees and that all those fees should be taken into account. (30 (b)(6) Dep. at 44:23-45:2); and (3) there are other expenses beyond the credit card issuer fees that are incurred by PRL to convert a tip into cash nightly, such as cash delivery (more frequent armored car deliveries of cash), charge-backs from credit card companies, bartenders' time cashing out, the accounting for proper withholding. 30 (b)(6) Dep. at 49:13-50: 5. PSI is adopting the same arguments in this case; there is nothing unique to PSI that it is asserting in this case with respect to the additional costs that PRL did not also assert in the *Steele* case. 30 (b)(6) Dep. at 50:6-9.

> RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

27.     There are no documents relating to the decision by PRL's management to implement PRL's Credit Card Offset Fee policy at its new location in Oakbrook Illinois. 30 (b)(6) at 74:2-14. However, COO Henderson was personally involved in the decision to implement PRL's Credit Card

Offset Fee at Perry's Oakbrook. 30 (b)(6) Dep. at 20:12-17. Henderson claims that "more than likely" he and Cortes were both involved in the decision to implement PRL's existing Credit Card Offset Fee policy at PSI, but Cortes denies he had any input into this decision.[4] 30 (b)(6) Dep. at 27:14-20, 36:24-37:4; HC Dep. at 97:8-10, 226:23-25; HC Ans. to Rogs., 1.

> RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material because, as noted by the Houston Court in the *Steele* case,[4] and as approved by the United States Court of Appeals for the Fifth Circuit in *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d at 247, the law concerning credit card tip offset fees was unsettled at the time of the *Steele* trial, and combined with the representations made to PSI's parent by the U.S. DOL representative concerning the validity of the credit card offset fee policy, PSI's parent operated in good faith in keeping the policy in place. *Id.*

28.     COO Henderson testified that PSI never discussed a specific Credit Card Offset fee percentage for PSI; just that the Credit Card Offset fee wasn't supposed to be a profit center. 30 (b)(6) Dep. At 40:18-41:20. Nor did PSI evaluate whether an alternate percentage was appropriate. *Id.* 30 (b)(6) Dep. at 40:18-41:20. Nor did PSI evaluate whether an alternate percentage was appropriate. *Id.*

> RESPONSE: *See* **Response to Fact Statement No. 27**.

29.     When making the decision to implement the same 3.25% policy as used by PRL, PSI claims to have relied exclusively on PRL's "historical data" regarding its costs in Texas for nightly conversion. It did nothing to ascertain whether the percentage used by PSI was justified based on PSI's actual expenses or costs in conversion. 30 (b)(6) Dep. at 39:13-40:14, 115:9-13. PSI deemed PRL's "data" sufficient to implement the same Credit Card Offset Fee policy. 30 (b)(6) Dep. at 39:17-21. PSI's expectation was that Perry's in Illinois would have a similar cost structure as PRL did in Texas. 30 (b)(6) Dep. at 38:2-13; HC Ans. to Rogs., 1.

> RESPONSE: *See* **Response to Fact Statement No. 27**.

30.     Just as with the challenged practice in PRL, the 3.25% fee at PSI included the payment of "credit card fees" and "guarded truck delivering of money . . . three or four times a week ..." HC Dep. at 217:11-25. PSI also attributed approximately 30 minutes a day to the added administrative costs associated with nightly cash out. 30 (b)(6) Dep. at 55:7-14. It was also never determined what the actual charges were to PSI for armored car delivery of cash. 30 (b)(6) Dep. at 50:20-51:3. No assessment of PSI's actual additional administrative costs was done because it "expected PSI to conform to what our experience was at PRL." 30 (b)(6) Dep. at 56:19-20.

> RESPONSE: *See* **Response to Fact Statement No. 27**. Further, Defendants deny the portion of this Statement that states that Mr. Henderson never actually determined other costs incurred by PSI because of the credit card offset fee policy. On the same page quoted by Plaintiffs, Page 51, in the testimony immediately following the citation above, Mr. Henderson indicates he took steps to determine the costs to PSI associated with implementing and maintaining the

---

[4] *See* **Exhibit "DD"** (Amended Houston Findings at p. 5).

credit card offset fee policy and states as follows:

> Q.     Okay. And was there any assessment done with respect to PSI's actual num-
> bers and to compare them to the PRL numbers at all?
>
> A.     From a credit card perspective, no, because the expectation was it
> would operate the same or very similar to credit cards that happened
> at PRL. **The cash delivery, you know, obviously, it was similar
> costs or higher. I mean, it certainly wasn't lower**. So, no, there
> was no change of the percentage.

> *See* **Exhibit "O-1" (Henderson Dep. at p. 51: 4-12).**

31.     Subsequent to Perry's Oakbrook opening, Defendants did not conduct any additional as-
sessment of the Credit Card Offset Fee to determine if 3.25% continued (in their opinion) to be an
appropriate amount to charge back its servers. 30 (b)(6) Dep. at 39:13-40:13, 48:3-12. In fact,
Defendants do not know how much of the charge card revenue gets charged back to PSI on a
weekly, monthly or annual basis; it never determined what the aggregate amount charged to PSI
by the credit card companies was because "the expectation was it would operate the same or very
similar to credit cards that happened at PRL." 30 (b)(6) Dep. at 55:13-16; 30 (b)(6) Dep. at 49:7-
12. All revenues were put in the same bucket for determining the percentage PRL/PSI would pay
to credit card companies based on their "tier." 30 (b)(6) Dep. at 51:15-52:15.

> RESPONSE: *See* **Response to Fact Statement Nos. 27 and 30**.

32.     PSI simply continued to convert credit/debit payments at a rate of 3.25% even though the
highest amount to process these types of payment at Perry's Oakbrook did not exceed 2.9% per
swipe. 30 (b)(6) Dep. at 46:7-23.

> RESPONSE: Defendants deny the allegations in this Statement. Mr. Henderson made clear
> in his deposition conducted by Plaintiffs' counsel that credit card fees could exceed the "max-
> imum rate" imposed in those situations where a problem occurred with a credit card "swipe":

> Q:     So would the average credit card processing fee, taking it into a composite,
> if you will, of all the fees that are charged -- because each company charges
> a different fee, correct?
>
> A.     Yes.
>
> Q.     These credit card comp -- so I believe in the Steele case, it was shown that
> the charges by the various companies ranged from 1.57 percent to American
> Express at 2.9 percent. Do you recall that?
>
> A.     There is a range. Each card is different. American Express can get as high
> as 3.23 percent if it's entered manually, or there's other things that American
> Express will, you know, impose additional fees.
>
> Q.     Okay. But, generally, 2.9 percent is the American Express charge?

A.    If it's swiped without having to enter it in or any other thing that they deem is a higher risk for fraud.

Q.    Sure. So when a number is manually put in, the credit card company assesses a larger fee for that process, correct?

A.    Correct.

*See* **Exhibit "O-2"** (Henderson Dep. at p. 46: 7-23).

33.    The amount of PSI's actual monthly credit card expense can be determined from documents produced by PSI during discovery. For example, on PSI's Merchant Statement, its Summary of Bankcard Deposits from Wood Forest National Bank in Texas for December 2013 provides the rates charged by the credit card issuer to PSI for Master Card ("MC"), Visa and Discover. Perrys007406-07412. American Express's credit card fees for December 2013 were produced as Perry's 007413-7417 (together 30(b)(6) Dep. Ex. 5. See Plaintiffs' Exh. 19).

RESPONSE:  *See* **Response to Fact Statement No. 27**.

34.    The MC, Visa and Discover "Rate" ranges from .005 to .0295. Perrys007407-8. The total amount debited for fees was $12,090.34. Perrys007410. The total credit card sales were $543,274.35. Perrys007406. Dividing credit fees by total credit card sales, the total comes to .0222, or 2.2%. For American Express, its total debited amount for credit card fees was $6,915 43. Perrys007413. Total credit card charges were $236,527.74. *Id.* By dividing the credit card fees paid by the total of credit card sales, the total comes to .0292, or 2.9%. The MC, Visa and Discover cards charges were approximately 2x the amount of the American Express charges for month ($543,274.35 vs. $236,527.74). The combined fees paid by PSI for the entire month is approximately 2.4%. 30(b)(6) Dep. at 121:12-126:20.

RESPONSE:  Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014.  *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

35.    Defendant PSI further claims that when it decided to implement PRL's Credit Card Offset Fee policy at its newly opened restaurant in 2013, it relied upon the "approval" of a U.S. DOL investigator, given to PRL nine years earlier, in 2004, during a discussion between Perry's former COO Mark Collins and a DOL Investigator who was at Perry's investigating an unrelated FLSA violation. 30 (b)(6) Dep. at 41:17-22; Henderson Aff. at %7; Collins Aff. at 7-8.

RESPONSE:  Defendants admit the allegations in the first part of this paragraph, and admit that a DOL Investigator was at Perry's investigating an FLSA situation that was not related to the credit card offset fee policy.  However, Defendants deny that Plaintiffs' characterization of the contacts between Mr. Collins and the DOL Investigator were a "discussion."  Rather, as Mr. Collins indicates in his Affidavit (which is cited by Plaintiffs), he provided to the Investigator documentation pertaining to all of PRL's wage and hour procedures, including but not

limited to the credit card offset fee policy, and requested that the Investigator examine all of these to determine whether PRL was in compliance with all applicable laws. Mr. Collins recounts that the DOL Investigator reported back to him after conducting such a review that all of PRL's procedures (including the credit card offset fee policy) were in compliance. *See* **Exhibit "A"** at p. 3 (Collins); **Exhibit "B"** at p. 2 (Henderson).

36.     The DOL investigator, Chad Frasier, believes he may have spoken to Collins about credit card liquidation issue "because it was such a rampant problem among Texas restaurants." Chad Frasier Declaration filed in *Hoenninger* v. *Leasing Enterprises, Ltd*, l:14-cv-00798, Dkt. 167-1, filed on 5/1/17; 30(b)(6) Dep. Ex. 8, ("Frasier Dec.") at 3, attached hereto as Plaintiffs' Exh. 20.[5] Frasier does not remember any details of such a conversation. *Id.* However, Frasier also affirmatively states that the DOL Field Manual at the time stated:

> ...restaurants could charge their tipped employees no more than what the credit card companies charged the restaurant for liquidating credit carts tip. . . . Any advice or instruction I gave Perry's Steakhouse concerning this issue would have been consistent with the DoL Field Manual. Under no circumstances would I provide advice, instruction, consent, or approval contrary to the DoL Field Manual.

*Id.,* at ¶ 4.

> RESPONSE: Defendants deny the allegations in Statement No. 36 and object to Plaintiffs' attempted inclusion of their Exhibit 20 in connection with their Motion. Three different courts have already declared that the "Frasier Declaration" referred to herein did not constitute any admissible evidence, a standard which Plaintiffs have to satisfy when seeking relief under FED.R.CIV.P. 56. *See* FED.R.CIV.P. 56(c)(2). As made clear by FED.R.CIV.P. 56(c)(4), a declaration submitted pursuant to Rule 56 must be made on personal knowledge, and must "set out facts that would be admissible in evidence."

> When requesting the review of PRL's policies from the Department of Labor Investigator, Mr. Collins provided to the Investigator documentation pertaining to all of PRL's wage and hour procedures, including, but not limited to, the credit card offset fee policy, and requested that the Investigator examine all of these to determine whether PRL was in compliance with all applicable laws. Mr. Collins recounts that the DOL Investigator reported back to him after conducting such a review that all of PRL's procedures (including the credit card offset fee policy) were in compliance. *See* **Exhibit "A"** at p. 3 (Collins); **Exhibit "B"** at p. 2 (Henderson).

> The San Antonio Court in *Shaffer* summed up most succinctly the evidentiary flaws in this Declaration when it was presented there by Plaintiffs in response to PRL's motion for summary judgment:

> > "The only new evidence presented to the Court with respect to the Department of Labor investigation is the declaration of Charles Frazier, the Department of Labor investigator assigned to Perry's during this time period. [citation omitted] Plaintiffs maintain that Frazier's declaration is evidence that Perry's was alerted during the

---

[5] Note, this Declaration was executed on April 26, 2013.

investigation to the illegality of their tip-fee policy. Yet, the only statement Frazier makes in his declaration regarding the tip-fee policy is exceedingly vague and speculative. Frazier states that "[although I do not remember the details of my conversations with Perry's Steakhouse ownership, management, and/or legal counsel during the 2003-2004 investigation, we probably discussed the credit card liquidation issue because it was such a rampant problem among Texas restaurants. [citation omitted] Frazier's lack of memory of any *actual* conversation is not competent summary judgment evidence that proves Perry's had knowledge that its policy violated the FLSA.

*See* **Exhibit "GG-1"** at pp. 9-10. [Original Emphasis].[6]

37.     On January 12, 2006, three years prior to the *Steele* case, the U.S. DOL issued Opinion Letter FLSA2006-1. See Plaintiffs' Exh. 21. The DOL was asked the following question:

> May our client, a restaurant-employer take an average standard composite percentage deduction from its server's tips to cover the cost of liquidating charged tips? And, if so, what specified direct costs in addition to credit card fees may it include in computing the standard composite percentage deduction?

*Id.,* page 1 of 3. The Opinion Letter states that it is "the Wage and Hour Division's position that the other costs that your client wishes the tipped employees to bear must be considered the normal administrative costs of your client's restaurant operations." *Id.,* page 2 of 3. It further states:

> An employer may deduct an average standard composite amount for tip liquidation, rather than individually calculating the precise charge for each transaction, so long as the total amount collected reasonably reimburses the employer for no more than the total amounts charged by the credit card companies attributable to liquidating credit card tips. *Any employer attempt to deduct an average standard composite amount for tip liquidation that exceeds such expenditures is not acceptable.*

*Id.* (emphasis added).

> RESPONSE: Defendants admit the quotations in this Statement, but deny that this Statement is material. As determined by the United States Court of Appeals for the Fifth Circuit as a matter of law in *Steele v. Leasing Enterprises, Ltd.*, the law concerning credit card offset fee policies was unsettled until the time of its ruling in 2016. **See Exhibit "EE" (Amended Houston Findings at p. 5).**

38.     Subsequent to the verbal opinion allegedly given to PRL's former COO Collins that PRL's Credit Card Offset Fee met DOL standards, neither PRL or PSI checked with the U.S. DOL to

---

[6] The Magistrate Judge's Report and Recommendation were accepted by the U.S. District Judge on or about Feb. 12, 2019, and Defendant's motion for partial summary judgment was granted. *See* **Exhibit "GG-2,"** *Dkt. No.* **118.**

determine if the investigator's alleged opinion still held. 30(b)(6) Dep. at 70:12-72:10.

RESPONSE: Defendants deny the allegations in this Statement. *See* Response to Fact Statement **No. 37**.

39. Defendants assert that from the time it opened in November 2013 until mid-October 2014, PSI cashed out servers' credit card tips on a nightly basis at the request of Servers at PSI. 30 (b)(6) Dep. at 26:14-18; PSI Ans. to Rogs., 11. However, in their most recent filing, Defendants clarify that "because servers then employed by PSI's parent entity, (then known as "Leasing Enterprises, Ltd.," and later known as "Perry's Restaurants, Ltd.") requested that they receive their credit card tips in cash on a nightly basis, rather than having to wait until a regular payday to be paid such proceeds, the parent entity in 2003 evaluated the costs of undertaking such a policy." Dkt. No. 305, Affirmative Defense No. 3; Henderson Aff. at 4 ("at server's 'insistence'").

RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos.* **292, 293, 295;** *see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5)**.

40. At no time during server orientation at PSI were servers given a choice, either in writing or verbally, to not get paid out nightly so as to not incur the 3.25% conversion fee. 30 (b)(6) Dep. at 35:11-17. This was because no option existed. *Id.* PRL's POS and accounting systems were set up to either charge the Credit Card Offset Fee or not; it was an either or proposition. If PSI had not adopted the existing PRL Credit Card Offset Fee policy when it opened in November 2013, it would have required modifications to the PRL payroll system and it was easier to just implement the same payroll system. 30 (b)(6) Dep. at 35:2-10; see also Henderson Aff. at ¶ 14.

RESPONSE: Defendants deny this Statement. Servers uniformly expressed their desire to receive their credit card tips on a nightly basis rather than having to wait to be paid such compensation on a weekly or bi-weekly basis via paycheck. *See* **Exhibit "O-3" (Henderson Dep. at pp. 32:4-34:1); Exhibit "O-4," (Henderson Depos. at 26:14-17); Exhibit "B" (Henderson Affidavit at pp. 1-2).**

41. Defendant PSI is not directly aware of any PSI servers who made the request to be cashed out nightly; it was Henderson's "understanding," through a discussion with GM Cortes, that requests for nightly cash outs were made. 30(b)(6) Dep. at 33:14-34:1. When asking Cortes if servers ever requested to be cashed out on a nightly basis, he replied that the Servers did not request to be cashed out nightly. His answer further explained that that is "how we did it," and, that he "[knew] that servers preferred [nightly tips]." HC Dep. at 211:14-21.

RESPONSE: Defendants deny the allegations in this Statement. See **Response to Fact Statement 40**.

42. PSI charged the Credit Card Offset fee or a server's entire credit card tip even though a portion of the tip was given to bussers, hostess, food runners, and bartenders ("tip share recipients") in their bi-weekly paychecks. For example, on page 2 of Plaintiffs' Exh. 15 (Perrys 0007700), it

shows that server Shana Gunlogson's credit card tips were $283.53 to which 3.25% of $283.53 was deducted and equaled $9.21 of the tip refund amount. Server Gunlogson paid $60.09 from her tips to the tip share recipients. That portion was not converted to cash and given to her. Her net total cash owed was $181.90. See also Perrys 007716 of Plaintiffs' Exh. 15. Server Korpolewski is another example. Korpolewski was charged $3.25% of his credit card tips of $244.42, which equaled $7.94. Korpolewski's net cash payment was $122.21 after deducting the tip refund and tip share. Korpolewski was charged a conversion fee for a portion of his credit card tips that went to tip share recipients in their bi-weekly paychecks. See SOMF ¶18.

> RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5)**.

43.     PSI did not investigate Illinois law to determine if its Credit Card Offset Fee policy violated **any** Illinois wage laws. See SOMF ¶12. Servers did not give written authorization to PSI to take deductions for a credit card offset fee. Deposition of Shana Gunlogson at 110:22-24 ("SG Dep."), Plaintiffs' Exh. 55.

> RESPONSE: Defendants deny the allegations in this Statement. As indicated above, *see* **Response to Statement No. 40**, servers unanimously expressed the desire to receive credit card tips in cash on a nightly basis. Further, particularly considering the directive from the Illinois Administrative Code that interpretation of the IMWL should be guided by interpretations of the FLSA, *see* Illinois Administrative Code §210.120, there was no indication that Illinois Law established a different legal doctrine concerning credit card offset fees (unlike a few States which have barred using such a policy) from FLSA requirements, and at the time of the origination of the credit card offset fee policy by PSI, the law about credit card offset fees was unsettled. *See Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 247-48 (5th Cir. 2016).

> Even so, this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5)**.

44.     From November 2013 to mid-October 2014, other than receipts that show a deduction for "Tip Refund," there are no documents that inform or explain to servers what a "Tip Refund" is or that their credit card tips were subject to a deduction to cover the cost of converting their tips to cash on a nightly basis. HC Dep. at 208:4-8; 30(b)(6) Dep. at 30:21-31:16, 35:1117. See Plaintiffs' Exh. 14 ("Castaldo Checkout Report"). Neither the Employee Handbook nor the Server's Development Guide provided to Servers hired between September 2013 and mid- October 2014, provide any information about the Credit Card Offset Fee policy. See Plaintiffs' Exh. 22, Employee Hand-

book pre-October 2014, Perrys000102-103, 000115; Plaintiffs' Exh. 23, Plaintiffs' Exh. 24; Employee Handbook pre-October 2014, PerrysOOO 146-47, 000159; 30 (b)(6) Dep. 29:17-31:19.

> RESPONSE: Defendants deny the allegations in Statement No. 44. *See* **Response to Statement No. 40**. Also, this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5)**.

45.     Henderson (PSI) claims that it was his understanding that Cortes informed these servers that a nightly cash out would cost them 3.25%. 30 (b)(6) Dep. at 33:18-34:1. His knowledge, however, is only based on Cortes informing him, back in 2013, that policies and procedures were covered during training; not specifically that the 3.25% deduction from tips was covered. 30 (b)(6) Dep. at 27:18-32:18. Among other notices Cortes did provide to the servers he hired, notice of the credit card offset fee was not provided. HC Ans. to Rogs., 5. PSI did not inform its servers that they had the option to choose nightly tips at the 3.25% conversion fee, or, that servers could simply wait until payday without having to pay the excess in conversion fees; no such option on existed. 30 (b)(6) Dep. at 35:11-36:4.

> RESPONSE: Defendants deny the allegations in Statement No. 45. *See* **Response to Statement No. 40**.

46.     Cortes hired all servers within the 2013-2014 time period. SOMF ¶14. Cortes was responsible for providing proper notice of wage and hour laws. HC Dep. at 119:24-120:12. Cortes admitted that he did not know what the FLSA is nor does he recall being trained on it. HC Dep. at 99:8-21. As a result, Cortes did not tell his servers of the portion of tips they are entitled to keep. HC Dep. at 121:18-25.

> RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5)**. Further, as demonstrated in Defendants' Memorandum, ***Dkt. No. 308*** at p. 18, Plaintiffs were properly provided the required notice.

47.     At his deposition, Cortes could not confirm whether the 4.5% deduction for the tip pool was ever communicated to the servers in writing, nor is there any documentation in existence supporting that Perry's provided written notice of the 4.5% deduction during this time. HC Dep. at 193:3-17. From mid-November 2013 through October 2016, the Employee Handbooks issued by PSI to its employees did not make any reference to the "tip credit rate" or "Tip share." See Plaintiffs' Exhs. 22-24, Employee Handbook October 2014, Perrys030587-88, 030598, 000159; Plaintiffs' Exh. 25, Employee Handbook date unknown, Perrys000l 18-89, 200; Plaintiffs' Exh. 26, Employee Handbook October 2016, Perrys030619-21, 30632-33.

> RESPONSE: *See* **Response to Fact Statement No. 46**.

48.     From mid-November through at least mid-October 2014, parties with 8 or more guests received a mandatory addition to their check known as a "service charge." Customers had no discretion in the amount to be added to the bill for that purpose. Since the term "service charge" is also used to describe a charge imposed for a private party or event, it is more accurate to indicate that the mandatory gratuity for parties of 8 or more in the dining room was an "automatic gratuity." In either event, the automatic gratuity or a service charge, the money was handled the same as any other "tip" or "gratuity," except that a portion of the service charge for private events would be allocated to the sales manager or event coordinator who had worked with the customer to set up the event. HC Ans. to Rogs., 1 and 11.

   RESPONSE:  Defendants deny the characterization in this Statement which appears to equate "tip" or "gratuity" with "service charge."  They are not equivalent terms.  *See* **Exhibit "II,"** 29 C.F.R. §531.55.  The U.S. Department of Labor Regulations differentiate between a "tip" or "gratuity" and "service charge" as indicated below.

This Regulation states as follows:

*§531.55   Examples of amounts not received as tips.*

(a) A compulsory charge for service, such as 15 percent of the amount of the bill, imposed on a customer by an employer's establishment, is not a tip and, even if distributed by the employer to its employees, cannot be counted as a tip received in applying the provisions of section 3(m) and 3(t). Similarly, where negotiations between a hotel and a customer for banquet facilities include amounts for distribution to employees of the hotel, the amounts so distributed are not counted as tips received.

(b) As stated above, service charges and other similar sums which become part of the employer's gross receipts are not tips for the purposes of the Act. Where such sums are distributed by the employer to its employees, however, they may be used in their entirety to satisfy the monetary requirements of the Act.

Further, this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are  not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014.  *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

49.     During the mid-November 2013 to mid-October time frame, servers were assigned on a rotating random basis, to serve as a "Captain" for a private dining event. If more than one server worked as a captain on such event, then the total tip would be split equally between the servers, HC Ans. to Rogs., 1; PSI Ans. to Rogs., 11; JP Dep. at 108:8-109: 7. Typically, a server who worked a table of eight or more customers or who worked a private "Captain's" event, would receive his or her compensation (in cash) for such work within one day after the event in question. PSI Ans. to Rogs., 11. After mid- October 2014, any compensation paid to a server for such private event work would be included in his or her regular payroll check. *Id.*

   RESPONSE:  Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues

are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos. 292, 293, 295; see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

50. The Server's Guide is the only written notice to servers as to the amount they would receive as a "gratuity" (payment) for working a private (Captain) event. The Server's Development Guide was updated several times between November 2013 and 2017. Each version of the Server's Guide states:

> The party should follow all party rules, however gratuity and coordination are added to bill by a manager: 19% Gratuity, 1% Coordination Fee. See Plaintiffs' Exh. 27, Servers Guide, Perrys000367,000393-396; Plaintiffs' Exh. 28, Servers Guide, Perrys000220, 246-249; Plaintiffs' Exh. 29, Servers Guide, Gonzalez000033-37; HC Dep. at 234: 8-10.

RESPONSE: Defendants admit the allegations in this Statement but this Statement is not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues are not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos. 292, 293, 295; see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

51. When PSI served private events (or large parties of eight or more,) it automatically recouped from servers 3.5% for its Credit Card Offset fee rather than 3.25% that was the amount set for main dining room credit card offset fees, and regardless of the actual amount of the credit card processing fee for the event. 30 (b)(6) Dep. at 111:15-112:14. At his deposition, COO Henderson's only explanation for this variation in credit card offset fee was that he *believed* customers most often used American Express to charge private events. *Id.*

RESPONSE: Defendants admit the allegations in the first sentence of this Statement but contend that it is not material because the issue is not properly before the court based upon the Defendants' payment of the back wages and IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-October 2014. *See Dkt. Nos. 292, 293, 295; see* **Exhibit "HH" (Transcript of January 9 Hearing at pp. 4-5).**

Defendants deny the second sentence of this Statement because it mis-characterizes the cited testimony of Mr. Henderson, who actually testified as follows on pages 111-12 of his deposition:

> Q. Okay. Can you explain to me why if in all other respects the server's compensation is calculated in a manner for private parties and large parties as it would be for any other table that they may wait on, why it is that Perry's decided that it would assess 3.5 percent versus 3.25 percent on those events?
>
> A. The majority of corporate events or corporate functions use Corporate

American Express cards and/or use credit cards from a third-party pay-
ment company, which a lot of the pharmaceutical events, other events
use third-party payments, so they would fax over an image of a credit
card, which, as I testified to earlier, credit card companies assess a
higher percentage when it's not swiped in person, which happened
quite often on private events. So that thought process necessitated the
higher amount.

*See* Plaintiffs' **Exhibit "O-5"** (Henderson Depos. at pp. 111-12).

52.     Servers were not informed that credit card processing fees deducted in large private events
were higher than credit card processing fees deducted for serving in the dining room. Deposition
of Steven Pottle at 61:12-18 ("Pottle Dep."), Plaintiffs' Exh. 8; Deposition of Jay Anich at 126:7-
11 ("JA Dep."), Plaintiffs' Exh. 53; See also SG Dep. at 111:16-23.

RESPONSE:  Defendants deny the allegations in this Statement.   Even so, this Statement is
not material to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those
issues are  not properly before the court based upon the Defendants' payment of the back wages
and IMWL interest that accrued as the result of the use of the credit card offset fee prior to
mid-October 2014.  *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January
9 Hearing at pp. 4-5).**

53.     Servers were also only paid 18% of the 20% service charge and 2% went to the event
coordinator. HC Dep. at 233:25-234:7; 30(b)(6) Dep. at 110:13-25; Pottle Dep. at 77: 10-78:12.

RESPONSE:  Defendants admit the allegations in this Statement but this Statement is not ma-
terial to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues
are  not properly before the court based upon the Defendants' payment of the back wages and
IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-
October 2014.  *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9
Hearing at pp. 4-5).**

54.     The "Captain" system stopped in mid-October when Perry's stopped deducting the Credit
Card Offset Fee and started paying credit card tips through a weekly payroll system. Pottle Dep.
at 63:1-6; HC Ans. to Rogs., at 1.

RESPONSE:  Defendants admit the allegations in this Statement but this Statement is not ma-
terial to Plaintiffs' credit card offset fee base wage claim or IMWL claim because those issues
are  not properly before the court based upon the Defendants' payment of the back wages and
IMWL interest that accrued as the result of the use of the credit card offset fee prior to mid-
October 2014.  *See **Dkt. Nos. 292, 293, 295;** see* **Exhibit "HH" (Transcript of January 9
Hearing at pp. 4-5).**

55.     PSI's Corporate Representative, Henderson, made the decision to end the Tip Refund pol-
icy after the *Steele* decision. 30(b)(6) Dep. at 89:11-22. The Credit Card Offset Fee policy for all
Perry's restaurants was discontinued in mid-October 2014, approximately two months after the
*Steele* District Court final decision was rendered. 30 (b)(6) Dep. at 85:1-12. Despite the possibility
of disabling the Credit Card Offset Fee policy on PSI's POS system immediately, Henderson said

he never tried to do so because PRL wanted to "change everything at once." 30 (b)(6) Dep. at 84:16-25,105:15-19.

RESPONSE: Defendants deny the allegations in Statement 55. The Houston Court did not "render a final decision" in August 2014. It did not enter judgment until February 2015. *See* **Exhibit "FF."**

The Austin Court was presented in the *Hoenninger* case with the identical argument now made by Plaintiffs, that is, the assertion that PSI should be held responsible for additional statutory damages because of the six week interval between the issuance of the Houston Court's initial Findings of Fact and Conclusions of Law in August 2014, and PRL's and PSI's discontinuation of the credit card offset fee policy in early October 2014, rather than immediately terminating the credit card offset fee policy. The Austin Court stated succinctly that as a matter of law, this six week delay did not demonstrate willfulness:

"The court concludes that termination of the Tip Fee Policy at Perry's two months after the Houston court concluded that the policy was unlawful, and well before final judgment was rendered or later affirmed, does not constitute a willful violation of the Act." **Exhibit "H"** at p. 2, *Hoenninger Dkt. No.* **182**.

Further, the last sentence of this Statement inaccurately characterizes Mr. Henderson's testimony by taking the quoted comment out of context. What Mr. Henderson actually stated was: "As I said, we wanted to change all of it, the payroll and everything else, at the same time." *See* **Exhibit "O-6"** (Henderson Depos. at 84).

Finally, the sentence erroneously includes a reference to Mr. Henderson's testimony on page 105 as being pertinent to this issue. In reality, that testimony was directed at a question inquiring hypothetically about whether the Aloha POS System could be manipulated to change a calculation concerning net sales minus tip share, not the nature of the actual dismantling process of the credit card offset fee policy in October 2014. *See* **Exhibit "O-7"** (Henderson Depos. at p. 105).

56.     **DELETED**

RESPONSE: No response required.

57.     PSI has never employed any individual whose sole responsibility is "maintenance or cleaning"; there is no cleaning crew. Bus boys were partly responsible for cleaning and disposing of trash, and vacuuming; and, kitchen workers were responsible for cleaning their own work stations. General overall cleaning services, including deep cleaning, have been provided exclusively to PSI by an outside cleaning service which typically has performed such cleaning services at the restaurant approximately every four weeks. PSI Ans. to Rogs., 10. Dishwashers mop the floor. Bussers mop halls and clean restrooms. Vacuuming is done either monthly or quarterly. Cleanliness is a priority. JP Dep. at 79:9-82:6.

RESPONSE: Defendants admit the allegations in this Statement. PSI does not require servers to perform non-tipped occupation jobs.

58.     Perry's hours of operations are Sunday 4 pm to 9 pm, Monday through Thursday 9 am to 10 pm, Friday 11 am to 10 pm, and Saturday 4 pm to 10 pm. HC Dep. at 173:16-20. Perry's POS system allows Perry's employees to clock in and select a job code. HC Dep. at 168:1-12. Cortes is unfamiliar with the phrase "Dual Jobs," but he does know that there are different job codes for different types of work. HC Dep. at 168:6-12,108:17-20.

   RESPONSE:  Defendants admit the allegations in this Statement but denies the assertions concerning hours of operation.  The Restaurant was only open for lunch on Fridays, and otherwise, was open from 4:00 P.M. to 10:00 P.M.

59.     On Mondays, which is generally a slow night, there may be 5-6 servers assigned to work. Other weeknights would result in a few more. Saturdays would likely have over 20 servers. HC Dep. at 175:10-22. Servers are assigned to either the main dining room, the cocktail area or a private event. In the dining room, a server is assigned a station that consists of 3-5 tables. RG Dep. at 58:20-23. In the cocktail area, there are more tables assigned per server; a server could have up to 7 at a time. *Id.*, at 103:22-24. Some guests in the Cocktail area are there to drink, but most are there to eat and some do the "full experience." *Id.,* at 5:9-14, 84:5-85:8.

   RESPONSE:  Defendants admit the allegations in this Statement.

60.     Peak time is 6:30-7 pm. JP Dep. at 180:4-8. For the lunch shift on Fridays, all servers assigned to that shift are expected to report for work at 10 am. PSI Ans. to Rogs., 8. For the dinner shift, servers reported at varying times depending on whether they were considered an "opener," a "closer" or just had regular assigned duties, or when the restaurant is especially busy. PSI Ans to Rogs., 8; Plaintiffs' Exh. 30. Openers start at 3pm, servers generally at 4:30 pm, closers at 5:30 pm and everyone starts at 3 pm on weekends. Deposition of Rodolfo DeReza at 60:2-7 ("DeReza Dep."), Plaintiffs Exh. 9. If assigned a private event, servers must come in early to set up. DeReza Dep. at 110:9-13. Opening servers get the first two tables. Closers get the next two tables and then assignments rotate. RG Dep. at 60:8-17; Pottle Dep. at 90:1-3.

   RESPONSE:  Defendants admit the allegations in this Statement.

61.     There are three types of side work assignments at Perry's; opening, running and closing. See Plaintiffs' Exh. 31. There is a list of opening and closing side work which is kept on a clipboard in the kitchen. The lists are laminated, and servers' names are placed on the various items listed and erased at end of the day. DeReza Dep. at 61:17-24; Plaintiffs' Exh. 32. There is also a list of general closing side work in the Servers' Development Guide, and a list of pre and post side work found in the banquet section. Plaintiffs' Exh. 33, and 27-29. Other than these 3 items, nothing else in writing describes side work duties. *See* Pottle Dep. at 94:17-23.

   RESPONSE:  Defendants admit the allegations in this Statement, except for the last sentence. That sentence should read that "Mr. Pottle ***does not know of*** anything else in writing that describes side work duties." *See* **Exhibit "Y-1"** (Pottle Dep. at 94:17-23).

62.     Cortes created the side work policy at Perry's Oakbrook. Cortes received no training on how to set up this policy, it was just as what is done at other locations. HC Dep at 108:20-10911.

Side work policy or procedure has not changed at all except recently. JP Dep at 139:13-19.

RESPONSE:  Defendants admit the allegations in this Statement.

63.    In addition to assigned side work, each server is also responsible for the side work that needs to be done for their own section of tables before and after service. DeReza Dep. at 65:166:3; JP Dep. at 144:8-17. Servers working a private event will not be assigned side work from the Side work Chart, (other than everyone must do forks and knives), but they are still doing opening and closing side work. JP Dep. at 145:7-14; Pottle Dep. at 159:9-24; Plaintiffs' Edhs. 27-29.

RESPONSE:  Defendants admit the allegations in this Statement but challenge the inclusion of the portion of the first sentence of this Statement that refers to "side work that needs to be done for their own section of tables before and after service."  This information is not material because Plaintiffs in their deposition questions and in their Motion and Memorandum for Partial Summary Judgment specifically disavow seeking to recover wages performed for what has been called "running side work," that is, any side work performed other than during the opening or the closing of the Restaurant.  *See* **Plaintiffs' Motion for Summary Judgment, Dkt. No. 312 at p. 2 ¶ 2; Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, Dkt. No. 315 at p. 21, ¶ 2, n. 17.**

That evidentiary reference is to a statement by Plaintiffs' counsel as a preface to a question to Rudolfo De Reza during his deposition about doing "opener" side work.  Plaintiffs' counsel's statement was as follows:  "We talked about the fact that there was opening side work, running side work, and closing side work.  The purposes (*sic*) of this lawsuit **we** **are** **only** **really** **concerned** **with** **the** **opening** **side** **work** **and** **the** **closing** **side** **work**."  *See, e.g.,* **Exhibit "Z-1"** (De Reza Depos. at p. 60:11-16) (emphasis added).

64.    Closers assign closing side work to servers. DeReza Dep. at 62:1-4; Plaintiffs' Exh. 32. The closing side work is usually assigned by the closer about an hour before closing. DeReza Dep. at 98:10-14. Two closers are always assigned. JP Dep. at 181:9-10. Closers are required to oversee the side work completed by all the other servers. Pottle Dep. at 156:15-24. Closers sometimes send servers back to redo something. DeReza Dep. at 99:8-11; Pottle Dep. at 157:2-10. Servers need two people to sign off on closing duties before they can leave for the night. Pottle Dep. at 156:15-24.

RESPONSE:  Defendants admit the allegations in this Statement.

65.    Defendants claim the types of work performed by servers would usually be less than one hour of a total shift. PSI Ans. to Rogs., 9. However, Pagnotta acknowledged that average time spent on opening is 30 minutes and that the average time on closing side work is 30-45 minutes. JP's Dep. at 142:12-24. Each server who has testified or provided a Declaration in this matter, excepting Defendants' server witnesses, Pottle and DeReza, all state that side work typically takes much longer. See SOMF ¶ 66 (footnote omitted).

RESPONSE:  Defendants object to the admissibility of the last sentence of this Statement under FED.R.CIV.P. 56(c) as argumentative and inadmissible.  Otherwise, Defendants admit the allegations in the first two sentences.

66.     For example, Rosie Gonzalez stated the quickest time for an opener is 45 minutes and the average time would be an hour and a half. Quickest for closer, would be 1 hour, and an average time one hour and a half. RG Dep. at 117:6-11,121:10-16. Carlos Gordoa says he had 1 1/2 to 2 hours of opening and closing every day he worked at Perry's and that he spent 40-50% of his time doing side work. CG Dep. at 112:23-113:6; 130:1-31. Server estimates include: at least 30 minutes to 1 hour for each (Declaration of Sandra Joseph (Bader) at ¶60 ("SJB Dec."), Plaintiffs' Exh. 40); 30 min to 1 hour for opening and 30 minutes to 2 hours closing (Declaration of Joseph Lozano at 61, 63 ("JL Dec."), Plaintiffs' Exh. 41); 45 minutes to an hour opening and 1 hour to 1.5 hours closing (Declaration of Stephen Turnbull at 75-76 ("ST Dec."), Plaintiffs' Exh. 46); Declaration of Cynthia Vernon at ¶¶ 80-81 ("CV Dec."), Plaintiffs' Exh. 47; 1 hour each for opening and closing (Declaration of Jay Anich at ¶82-83 ("JA Dec."), Plaintiffs' Exh. 36); 1 hour for opening and 1-2 for closing (Declaration of Jessica Berger at ¶93 ("JB Dec."), Plaintiffs' Exh. 37; Declaration of Krystal Burgess (Anich) at ¶¶ 80-81 ("KBA Dec."), Plaintiffs' Exh. 38; Declaration of Cheri Castaldo at 60-61 ("CC Dec."), Plaintiffs' Exh. 39; Declaration of Krystyna Majewski at 76-77 ("KM Dec."), Plaintiffs' Exh. 42; Declaration of Guy Redding at ¶¶ 104-105 ("GR Dec."), Plaintiffs' Exh. 44; Declaration of Joanna Schug at ¶¶ 65-66 ("JS Dec."), Plaintiffs' Exh. 45)(Collectively Plaintiffs' Exhs. 36-47).

RESPONSE:  Defendants deny the allegations made in this Statement because such statements do not constitute any admissible evidence, a standard which Plaintiffs have to satisfy when seeking relief under FED.R.CIV.P. 56.  *See* FED.R.CIV.P. 56(c)(2).  As made clear by FED.R.CIV.P. 56(c)(4), a declaration submitted pursuant to Rule 56 must be made on personal knowledge, and must "set out facts that would be admissible in evidence."  ***See* Exhibit "R-2" (Berger Dep. at pp. 107:19-108:1); Exhibit "P-1" (Anich Dep. at p. 77:15-20); Exhibit "AA-1" (Burrgess Dep. at 84:8-24); Exhibit "T-1" (Castaldo Dep. at 13:7-19); Exhibit "BB-1" (Gunlogson Dep. at p 64:12-18); Exhibit "X-2" (Gonzales Dep. at p. 69:1-7); Exhibit "V-1" (Maciejewski Dep. at p. 71:1-72:13); Exhibit "W-2" (Rendak Dep. at p. 33:1-19); and Defendants' First Amended Answer to Plaintiffs' Fourth Amended Complaint, Dkt. No. 305 at p. 38 ¶1.**

67.     There is only a small window to clock in before or after shift time, otherwise servers need a manager to override. DeReza Dep. at 59:11-19.

RESPONSE:  Defendants admit the allegation in this paragraph but this Statement is not material concerning the Plaintiffs' side work claims.

68.     Managers will say "if you have time to lean, you have time to clean." Pottle Dep. at 98:14-22; CG Dep. at 106:21-107:13. There is no break room at Perry's; no place to sit down and grab a coke after sidework is done and before guests arrive. DeReza Dep. at 105:10-13. Servers are required to ask permission of a manager before leaving the floor. *Id.* at 64:14-17.

RESPONSE:  Defendants deny the accuracy of the quote in the first sentence of this Statement, as well as its materiality, in that Plaintiffs' counsel immediately followed the quoted language by asking whether "there's always  sidework that can be done."  **Exhibit "Y-2"** Pottle Dep. at 98: 20-21.  As a result, this information is not material because Plaintiffs in their deposition questions and in their Motion and Memorandum for Partial Summary Judgment specifically disavow seeking to recover wages performed for what has been called "running sidework,"

that is, any side work performed other than during the opening or the closing of the Restaurant. *See* Defendants' Response to Statement No. 63; **Exhibit "Y-2"**.

Defendants admit the allegations in the remaining two sentences of this Statement.

69.     From the time a server clocks in until the time the server is assigned their first table, they are supposed to be doing sidework or helping out in some way. DeReza Dep. at 104:11-14 and 105:4-7. The time doing sidework should be, on average, similar for all servers. DeReza Dep. at 105: 16-22; JA Dep. at 131:10-21,132:1-11; Deposition of Sandra Joseph (Bader) at 146: 19-24 ("SJB Dep."); SJB Dec. at ¶59; KM Dec. at f 75; GR Dec. at ¶103; ST Dec. at ¶ 72.

RESPONSE: Defendants admit the accuracy of the text attributed to Mr. DeReza in this Statement. As indicated in response to Statement No. 66, Defendants deny the characterization of the conclusory second sentence in Statement 69. Such conclusory statement does not constitute admissible evidence, a standard which Plaintiffs have to satisfy when seeking relief under FED.R.CIV.P. 56. *See* FED.R.CIV.P. 56(c)(2).

70.     Opening sidework can be quantified by calculating the time a server clocks in and the time the server is assigned their first table. Deposition of Susan Breitenfeld at 178:9-179:4 ("SB Dep"). Plaintiffs calculated the time elapsed between the time each server (with the exception of one) clocked in and the times that they were assigned their first table of the shift, by creating a database using Plaintiffs Excel Spreadsheet (Perrys030856-Perrys032673) containing the names of the servers, each date the server worked, the job code used by Perry's, the time the server clocked in, the time the server clocked out, the server's pay rate and the total hours the server worked on that particular date and a computer-generated report of all the times servers were given table assignments on any given day, for all days that they worked from mid-October 2014 through 2017. Plaintiffs' Exh. 2. (Perrys032674-041892). The process of how Plaintiffs' Excel File (Plaintiffs' Exh. 1) was created is set forth in the Declarations of Kathryn Korak and Kelly O'Brien. Plaintiffs' Exh. 3 and 4.

RESPONSE: Defendants deny the information stated in this Statement. It is not based upon fact, but rather upon an unsupported "opinion" by one Plaintiff, bereft of any documentation allegedly showing the side work claimed to being performed. *See* Response to Statement No. 66; **Exhibit "R-3" (Berger Dep. at p. 20:16-21); Exhibit "R-4" (Berger Dep. at pp. 267:15-269:16**.

71.     The Plaintiffs' analysis shows that the opening sidework in 2014 was 23.15% of total time worked, 33.62% in 2015, 26.13% in 2016 and 25.68% in 2017. The total average percentage of time spent on opening sidework for all 4 years was 28.05% of all time worked. Plaintiffs' Exh. 1 ("% SW by wk" tab).

RESPONSE: Defendants deny the information stated in this Statement. *See* **Responses to Statements Nos. 66 and 70**.

72.     Servers described the opening, closing, and running sidework duties they are required to perform in their Declarations and Depositions. Descriptions include:

a.     Scooping applesauce and piping butter into several ramekins. JP Dep. at 176:2-

177:18. On a weekday, there can be as many as 200 ramekins to fill, but, on a weekend day, up to 400 ramekins. JA Dec. at 85;

b.      Polishing hundreds of silver ramekins. JA Dec. at ¶¶ 85-86;

c.      Cleaning the granite counter tops and breaking down tea and coffee stations. JA Dec. at 85- 86; GR Dec. at ¶¶107-108;

d.      Cleaning large and small trays; for example, scraping wax and butter off of trays followed by hot soaking and polishing. JA Dec. at ¶¶85-86;

e.      Vacuuming and sweeping the cocktail areas. JA Dec. at ¶¶85- 86; CC Dec. at 64; KBA Dec. at ¶¶82-83, 79;

f.      Polishing piano and vacuuming piano stage area. KBA Dec. at ¶¶82 and 83;

g.      Washing dishes before dishwasher arrived and wiping down kitchen surfaces, dish pit and distribution of shelves. KM Dec. at ¶¶78-79;

h.      Washing and polishing silverware and "double polishing knives." JA Dec. at ¶¶85- 86;

i.      Polishing centerpieces and candle holders. JA Dec. at ¶¶85-86;

j.      Washing down walls, ledges, shelves, chairs, and booths. JA Dec. at ¶¶85- 86; JB Dec. at ¶¶96 -97; KBA Dec. at ¶¶ 82-83. Table legs and bases were also required to be wiped down. JB Dec. at ¶¶96-97;

k.      Scraping gum off of tables and chairs, dish pit of glasses, plates, and silverware. CV Dec. at ¶¶82-83;

1.      Draining, washing, and sanitizing coffee and tea urns by hand. JA Dec. at 86;

m.      Scrubbing the wooden pork chop plates and emptying wine buckets to polish them. JA Dec. at %% 85- 86;

n.      Cleaning lamps and all dessert menus. JB Dec. at 96-97;

o.      Dusting shelves, knickknacks, and lamps. KBA Dec. at ¶¶ 82-83;

p.      Dusting the walls and "running dishes out of the dish pit," and, polishing glasses for the bar as well as one's own tables. SJB Dec. at 62-63;

q.      Folding 50 or more napkins and emptying the dish pit which required servers to then stock dishes and trays, sometimes 50 trays or more. JL Dec. at ¶ 64;

r.      Running plates out of the dish pit and putting them on the line in the kitchen. JA Dec. at ¶¶85-86;

s.      Cleaning various sections of the kitchen and cleaned dishes. CC Dec. at ¶64;

t.      Covering everything once a month on top of regular closing duties for pest control. CG Dep. at 113:16 - 24; JA Dec. at ¶¶ 85- 86;

u.      Putting doilies on hundreds of saucer plates. JA Dep. at 110:10-112:12;

v.      Setting up and taking down private events and moving heavy wrought iron tables. SG Dep. at 118:10-120:6; JA Dec. at ¶¶85-86; JB Dec. at ¶¶96-97. Retrieving tables and chairs and arranging them as well as setting up temporary service stations. CC Dec. at ¶ 62; SG Dep. at 118:10-120:6;

w.      Setting up the patio daily. RG Dep. at 76:20-77:2.

RESPONSE: Defendants admit that certain witnesses speculated about the nature and extent of various side work chores in this Statement. However, such information is not material for the following reasons: (a) **running side work**: as indicated above, *see* **Response to Statement No. 63**, Plaintiffs disavow seeking the recovery of any wages for any time spent performing "running side work;" and (b) **work unrelated to tipped occupation**: as indicated above, *see* **Response to Statement No. 63**, Plaintiffs concede in their Motion and Memorandum that they are not alleging, and are not seeking recovery of wages as to, any side work allegedly perform that might be classified as "not related to a server's tipped occupation. *See* **Responses to Statements Nos. 63 and 68**.

Plaintiffs' counsel stated as a preface to a question to Rudolfo De Reza during his deposition about doing "opener" side work: "We talked about the fact that there was opening side work, running side work, and closing side work. The purposes (*sic*) of this lawsuit **we are only really concerned with the opening side work and the closing side work**." *See, e.g.,* **Exhibit "Z-1;" De Reza Depos. at p. 60** (emphasis added).

Nevertheless, Defendants deny the materiality of these statements insofar as they attempt to interject a reference to side work that is not related to a server's tipped occupation. Even though Plaintiffs have disavowed seeking such recovery, they nevertheless have opted to incorporate into this Statement every conceivable task that any of them ever allegedly performed, whether once or more than once during their career with PSI. Given Plaintiffs own demarcation of materiality in this case, Defendants contest this Statement in its entirety because no effort is made to delineate for the Court the particular, "tipped occupation related," side work they claim to have performed. Defendants further challenge the admissibility of the opinion testimony stated in the second sentence of this Statement. *See* **Response to Statements Nos. 66 and 70**.

73.      Trays are cleaned using a sanitation bucket and dried to prevent odors. SG Dep. at 92:17-93:7. At the end of each night, servers carry a sanitation bucket to wipe and clean, for example, wooden pork chop platters. SG Dep. at 94:5-21. At Perry's, tasks were never-ending until closing person accepted responsibility of whatever was left. SG Dep. at 93:3-7.

RESPONSE: Defendants deny the allegations in this Statement. *See* **Response to Statement No. 72**.

## II. DEFENDANTS' ADDITIONAL FACT STATEMENTS SUBMITTED PURSUANT TO L.R. 56(B)(3)(C)

### A. COMPREHENSIVE CHART OF EXHIBITS

The following chart identifies the Exhibits being attached to this Statement. Because of Defendants' prior filing of full deposition transcripts of several witnesses, and for the Court's convenience, Defendants will utilize the "exhibit designation" (*e.g.*, Exhibit "O" as Rick Henderson Deposition) as a prefix for all references made to particular pages in such respective witness depositions in this Response. Where an exhibit was previously marked, *e.g.*, Exhibit "J," then the companion documents pertaining to that Exhibit which are used in this Response are designated as "J-1," "J-2," etc.

| Exhibit | Description |
|---|---|
| A | Affidavit of Mark Collins |
| B | Affidavit of Richard Henderson |
| D | Findings of Fact and Conclusions of Law in the Austin Lawsuit |
| E | Findings of Fact and Conclusions of Law in the Houston Lawsuit |
| H | Order by U.S. District Judge Yeakel (July 27, 2017) Denying Plaintiffs' Motion to Reconsider Denial of Motion for Partial Summary Judgment, filed in Hoenninger v. Leasing Enterprises, Ltd., Cause No. 1:14-CV-798-LY (W.D. Tex.), ***Dkt. No.* 182**. |
| J | U.S. Department of Labor Opinion Letter No. FLSA 2018-27 (Nov. 8, 2018) |
| J-1 | U.S. Department of Labor Field Assistance Bulletin No. 2019-2 issued on February 15, 2019. |
| J-2 | U.S. Department of Labor revised Field Operations Handbook § 30d00(f) issued on February 15, 2019 |
| O-1 thru O-7 | Additional Richard Henderson Deposition Excerpts |
| P-1 thru P-3 | Additional Jay Anich Deposition Excerpts |
| Q-1 | Sandra Bader Deposition Excerpt |
| R-1 thru R-4 | Additional Jessica Berger Deposition Excerpts |
| T-1 thru T-2 | Additional Cheri Castaldo Deposition Excerpts |
| U-1 thru U-3 | Additional Carlos Gordoa Deposition Excerpts |
| V-1 thru V-3 | Additional Krystyna Maciejewski Deposition Excerpts |
| W-1 thru W-3 | Additional Timothy Rendak Deposition Excerpts |
| X-1 thru X-2 | Additional Rosario De Leon Gonzalez Deposition Excerpts |
| Y-1 thru Y-4 | Steve Pottle Deposition Excerpts |
| Z-1 thru Z-5 | Rudolfo De Reza Deposition Excerpts |

| Exhibit | Description |
|---------|-------------|
| AA-1 | Krystle Burrgess Anich Deposition Excerpt |
| BB-1 | Additional Shana Gunlogson Deposition Excerpt |
| CC | Defendant Cortes Answer to Interrogatory No. 10 |
| DD | August 31, 2010 Interlocutory Ruling in Houston Lawsuit |
| EE | Amended Findings of Fact and Conclusions of Law in the Houston Lawsuit, issued February 2015 |
| FF | Final Judgment in Houston Lawsuit, issued in Feb. 2015 |
| GG-1 | Report and Recommendation of U.S. Magistrate Judge recommending granting of Defendant's motion for partial summary judgment on the issue of willfulness filed in *Shaffer v. Perry's Restaurants, Ltd.*, Cause No. 5:16-cv-01193 (W.D. Tex.), ***Dkt. No.* 102** |
| GG-2 | Order by U.S. District Judge Biery Accepting Report and Recommendation of U.S. Magistrate Judge and granting Defendant's motion for partial summary judgment on the issue of willfulness, in *Shaffer v. Perry's Restaurants, Ltd.*, Cause No. 5:16-cv-01193 (W.D. Tex.), ***Dkt. No.* 118** |
| HH | Transcript of January 9, 2019 Hearing |
| II | U.S. Department of Labor Regulation 29 C.F.R. §531.55. |

## B. ADDITIONAL FACT STATEMENTS SUPPORTING DEFENDANTS' RESPONSE: CREDIT CARD OFFSET FEE CLAIM

Defendants submit the following Additional Fact Statements to support their Response, demarcated by topic.

## 1. The January 9 Hearing on the PSI Payment

1. PSI tendered the payment to Plaintiffs' counsel in the amount of approximately $247,000 (hereafter, the "PSI Payment"). *See **Dkt. No. 292, 293, 295***.

2. The PSI Payment indisputably covered not only any wage differential to which eligible Plaintiffs (i.e., those who worked at PSI before October 12, 2014, when the policy was admittedly terminated) were entitled, but also the 2% monthly IMWL penalty that accrued on a monthly basis (paid through November 2018, as the check in question was issued in early December 2018). *See **Dkt. Nos. 292; 295***.

3.     The PSI Payment thus took three of the issues regarding the credit card offset fee "off the table," i.e., it segregated what the Court does not need to resolve:  injunctive relief; the base wages due; and IMWL 2% penalty interest.

(a)     There is no basis for seeking injunctive as to the credit card offset fee policy, because PSI indisputably terminated the challenged practice more than four years ago, before this lawsuit was filed and served upon it; and

(b)     The wages due and the IMWL interest were resolved not by an offer to pay the amounts claimed to be owed, but by the actual payment of these amounts; and

(c)     The PSI Payment narrowed the nature of the relief Plaintiffs may seek to FLSA liquidated damages and attorneys' fees, if any.  *See **Dkt. No. 295***.

4.     The Court conducted a hearing on January 9, 2019, on Plaintiffs' Resolution Motion.  *See **Dkt. No. 292***.  Plaintiffs' counsel's expressed concern at that Hearing on whether she was going to be able to recover attorney's fees in connection with the base wage claim by the Plaintiffs concerning the credit card offset fees.  *See* **Exhibit "HH**," Transcript of January 9 Hearing, Transcript at pp. 4-5.

5.      One of the reasons for rejecting the PSI Payment was Plaintiffs' counsel's concern about whether she was going to recover attorney's fees.  See **Exhibit "HH"** at pp. 4-5.

## 2. August 2010 Interlocutory Ruling

6.     The Houston Court declared in the August 30, 2010 interlocutory order which costs incurred in nightly cashing out of credit card tips were or were not properly considered in determining whether the credit card offset fee complied with the FLSA.  *See* Exhibit "CC."   The interlocutory and non-binding status of the August 2010 ruling was verified by the United States Court of Appeals for the Fifth Circuit in its subsequent appellate review of the Houston Court's judgment.  826 F.3d 237.

7.     The Houston Court stated in its Amended Findings of Fact and Conclusions of Law, issued the same day as judgment was entered in February 2015, that

> "Perry's reasonably waited for a final judgment on an unsettled area of law before changing its practice. Bad faith cannot be imputed to Perry's for a judgment that occurred after the fee system was established. Perry's acted reasonably and in good faith."

See Exhibit "DD" at p. 5.

### 3. Interim and Final Rulings by the Houston Court

8.     The Houston Court's August 2014 Initial Findings of Fact and Conclusions of Law were not a "final judgment" and the Houston Court later amended its Findings of Fact and Conclusions of Law in February 2015 to clarify that the policy also was not imposed in bad faith. *See* Exhibit "DD." The Houston Court did not enter a final judgment in that case until February 2015.

### 4. Updated Pronouncement By The Department of Labor Confirming the Retroactive Application of the November 2018 Opinion Letter

9.     The U.S. Department of Labor issued a companion pronouncement (or "Bulletin") to the 2018 Opinion Letter on February 15, 2019. *See* Exhibit "**J-1**." The DOL simultaneously issued its February 15, 2019, revised Field Operations Handbook § 30d00(f) (the "Revised Handbook"), and its Field Assistance Bulletin No. 2019-2 (the "Bulletin"). *See* Exhibit "**J-2**." The DOL notes that the Bulletin "provides guidance on a recent change to Field Operations Handbook (FOH) 30d00(f)." The Bulletin states that the Revised Handbook is to be used ***retroactively***, that is, in any open or new investigation concerning work performed prior to the issuance of the Revised Handbook. *Id*. at p. 3.

### 5. Limited Amount of Side Work Assigned

10.     PSI displayed an opening and a closing side work chart at the Restaurant that listed the duties assigned to each of the servers for a particular night. A copy of PSI's side work chart is attached as Plaintiffs' Exhibit 31. As outlined on the chart, the Openers and Closers had certain work assigned to them, but only on the nights they were assigned those roles. *Id*.

11.      Each server was, on average, assigned one or two tasks per night and would work with other servers also assigned to those tasks. *See* **Exhibit** "**Y-3**", **Pottle Depos. at 143:5-21**; **Exhibit "P-2;" Anich Depos. at 99:24-100:4; Exhibit "U-1;" Gordoa Depos. at 102:21-24; 109:9-19; Exhibit "W-3;" Rendak Depos. at 101:14-102:2; 127:16-128:2.**

12.      Further, all of the designated trial witnesses deposed acknowledged that they were only required to perform specific, selected side work assignments during a shift. *See* **Exhibit "P-3;" Anich Depos. at 96:4-97:12; 130:13-131:7; Exhibit "Q-1;" Bader Depos. at p. 71:2-71:6; Exhibit "T-2;" Castaldo Depos. at 91:22-92:9; Exhibit "U-2;" Gordoa Depos. at 108:17-109:2**.

13.      On average, it would take PSI servers 15-30 minutes to complete assigned opening side work and 15-30 minutes on average to complete assigned closing side work.  *See* **Exhibit "Z-2;" DeReza Depos. at p. 26**; **Exhibit "Y-1;" Pottle Depos. at p. 95**.

14.      Some level of set up and clean-up is generally expected of servers in the restaurant industry. At PSI, each server on average was assigned three to four tables per night. ***See* Exhibit "Z-3;" DeReza Depos. at 65: 8-13;"  Exhibit "V-2;" Maciejewski Depos. at 64:23-65:3; Exhibit "U-3;" Gordoa Depos. at 123:15-19.**   Additionally, each server was assigned certain opening and closing side work. ***See* Exhibit "Z-3;" DeReza Depos. at 65-66; Exhibit "W-3;" Rendak Depos. at pp. 101:14-102:2; 127:16-128:3; Exhibit "U-3;" Gordoa Depos. at 123:15-19**.

15.      These assignments were given by the server that was selected as the official "Opener" or "Closer" for the night. *See* **Exhibit "Z-4," "Z-5;" DeReza Depos. at 61: 17-24; 70:7-82:8; Exhibit "Q-1;" Bader Depos. at pp. 69:12-71:1; Exhibit "V-3;" Maciejewski Depos. at pp. 85:3-5, 8-19; 86:3-5; Exhibit "Y-4;" Pottle Depos. at pp. 101:1-7; 105:2-9; 122:8-17; 123:10.**

16.    Once servers completed their assigned side work, they would socialize, talk amongst themselves, or would not even commence their side work assignments until well after their arrival at the restaurant.  *See* **Exhibit "Y-1;" Pottle Depos. at 95: 4-22**.  That is, once a server completed his or her assigned side work, he or she would stand in the dining room waiting for the seating of a customer in his or her assigned section.  *See* **Exhibit "Y-2;" Pottle Depos. at 99: 14-21**.  PSI did not require, and did not expect, servers to be constantly engaged in side work activities prior to the arrival of their respective guests.  *See* **Exhibit "Y-2;" Pottle Depos. at 98:23-99:13**.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, DEFENDANTS PERRY'S STEAKHOUSE OF ILLINOIS, L.L.C., HOWARD CORTES and JEFFREY PAGNOTTA respectfully request that this Court enter summary judgment in their favor and against Plaintiffs on all of the claims enumerated above and in their Rule 56 Motion, and that the Court further grant such additional relief as it deems to be just and proper.

Dated: March 21st 2019.

PERRY'S STEAKHOUSE OF ILLINOIS,
L.L.C., HOWARD CORTES and JEFFREY
PAGNOTTA
By:  ___*/s/ Lionel M. Schooler*___
One of its Attorneys

Lionel Schooler (Pro Hac Vice) (lschooler@jw.com)
**Jackson Walker L.L.P.**
1401 McKinney Suite 1900
Houston, TX 77010
713/752-4516

Joseph M. Gagliardo (901989) (jgagliardo@lanermuchin.com)
Jeffrey S. Fowler (6205659) (jfowler@lanermuchin.com)
Laner Muchin, Ltd.
515 North State Street, Suite 2800
Chicago, Illinois 60654
312/467-9800

## CERTIFICATE OF SERVICE

I, Lionel M. Schooler, an attorney, hereby certify that on March 21, 2019, I caused to be served a copy of the foregoing Responses to Plaintiffs' Local Rule 56.1 Statements of Material Fact in the above-captioned matter to be filed with the Clerk of the District Court and served on the parties of record, including those listed below, by operation of the Court's CM/ECF electronic filing system, and by electronic mail, addressed to: Colleen M. McLaughlin (colleen@cmmc-em-ploymentlaw.com), Law Offices of Colleen M. McLaughlin, 1751 S. Naperville Rd., Ste. 209, Wheaton, Illinois 60187.

*/s/ Lionel M. Schooler*

Lionel M. Schooler