# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JESSICA BERGER and TIMOTHY RENDAK, ET AL., )
)
)
Plaintiffs, )
)
v. )
)
PERRY'S STEAKHOUSE OF ILLINOIS, LLC, )
HOWARD CORTES, and JEFFREY PAGNOTTA, )
)
)
Defendants. )

No. 14 C 8543

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

In this partial class and collective action, Plaintiffs, who worked as table servers at Perry's Steakhouse and Grille in Oak Brook, Illinois ("Perry's Oak Brook"), allege that Perry's Steakhouse of Illinois, LLC ("PSI"), which operates Perry's Oak Brook, and managers Howard Cortes and Jeffery Pagnotta (PSI, Cortes and Pagnotta collectively, "Defendants") failed to pay them all tips and other compensation owed, required them to perform non-table-service-related work at less than minimum wage, and failed to give them adequate notice of their intent to take a "tip credit" and use a "tip pool" in violation of the Fair Labor Standards Act and the Illinois Minimum Wage Law. Plaintiffs also seek relief under the Illinois Wage Payment and Collection Act, and under breach of contract and unjust enrichment theories. The parties filed cross motions for partial summary judgment. For the following reasons, both motions are granted in part and denied in part. R. 306; R. 312.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Background

PSI is a wholly-owned subsidiary of Texas-based Perry's Restaurants Limited ("PRL"). R. 313 ¶ 2; R. 329 ¶ 2. PRL—formerly known as Leasing Enterprises, Ltd.—is the parent company for all Perry's Steakhouse and Grille Restaurants located in Texas, Illinois, Colorado and Alabama. *Id.* PSI operates Perry's Oak Brook, which opened for business in mid-November 2013 and is the first Perry's restaurant in Illinois. R. 313 ¶¶ 1, 12; R. 329 ¶¶ 1, 12. PSI and PRL share a corporate office in Houston, Texas. R. 313 ¶ 3; R. 329 ¶ 3. PSI's headquarters is staffed solely by PRL employees, and all corporate PSI management is conducted through PRL employees from PRL's Texas headquarters. *Id.* Perry's Oak Brook is operated by PSI in the same

manner as all other Perry's restaurants, and many of its administrative functions are done by or run through PRL. R. 313 ¶¶ 4, 7; R. 329 ¶¶ 4, 7.

Howard Cortes served as Perry's Oak Brook's general manager from its inception until October 2014. Before that, Cortes worked for PRL at various Perry's locations in Texas. R. 313 ¶ 6; R. 329 ¶ 6. While general manager, Cortes was responsible for hiring, training and supervising employees; employee wage and hour classifications; employee compensation; timekeeping; and tip pool policies and procedures. R. 313 ¶¶ 6, 14; R. 329 ¶¶ 6, 14. Cortes did not receive any training on Illinois wage laws prior to Perry's Oak Brook's opening, he does not recall any FLSA training, and he did not know for certain during the relevant time period what the FLSA was. R. 313 ¶¶ 12-13; R. 329 ¶¶ 12-13. In October 2014, Cortes was promoted to PRL Regional Manager, and ultimately returned to Texas to oversee the Perry's locations there. R. 313 ¶ 6; R. 329 ¶ 6. Thereafter, Jeffrey Pagnotta, who had worked as a floor manager at Perry's Oak Brook from the fall of 2013 until October 2014, assumed Cortes's responsibilities as general manager. R. 313 ¶ 8; R. 329 ¶ 8.

Class representatives Jessica Berger and Timothy Rendak are former servers at Perry's Oak Brook and represent a Rule 23 class of 107[1] and opt-in FLSA collective of 29. R. 313 ¶ 9; R. 329 ¶ 9. Each Perry's Oak Brook server is a "tipped employee" as defined by the FLSA and is paid at the Illinois tip credit rate of $4.95 per hour (which is higher than the federal rate of $2.13 per hour). R. 313 ¶ 11; R. 329 ¶ 11.

---

[1] Although initially 115 servers made up the class, four servers opted out during the notice period and 4 were involuntarily dismissed. R. 313 ¶¶ 9-10; R. 329 ¶¶ 9-10.

Perry's Oak Brook uses an electronic Point of Sale ("POS") system to record its servers' hours, credit card transactions, tips, gratuities, and sales (among other things). R. 313 ¶ 16; R. 329 ¶ 16. At the end of each shift, the POS system generates a "checkout report" for each server, which the server reviews before taking it to a manager or bartender for their review. *Id.*

From opening in November 2013 until mid-October 2014, Perry's Oak Brook's servers were paid nightly in cash for all tips received during a shift, including those paid by credit or debit card. R. 313 ¶ 17; R. 329 ¶ 17. Servers' hourly wages were paid separately by check every two weeks. *Id.* During that same time period, two deductions were taken from servers' cash tips and reflected on servers' POS checkout reports: (1) a deduction representing 4.5% of the server's total sales, to be pooled and redistributed to hostesses, bussers, bartenders and food runners (the "tip pool"), and indicated on the checkout report as the server's "tip share"; and (2) a credit card offset fee in the amount of 3.25% of servers' credit and debit card tips (or 3.5% in the case of a private event or large party of eight or more), used to recoup the expense involved with the nightly cashing out of those tips, and referred to on the checkout report as the server's "tip refund." R. 313 ¶¶ 18-20, 51; R. 329 ¶¶ 18-20, 51. Defendants continue to operate a tip pool, and to employ the same tip pool deduction, but, for reasons explained below, PSI stopped deducting the credit card offset fee in mid-October 2014, and started paying credit card tips through its weekly payroll system. R. 313 ¶¶ 54-55; R. 329 ¶¶ 54-55.

In addition to claims related to Defendants' tip pool and credit card offset fee deductions and of relevance here, Plaintiffs also bring claims related to the notice (or lack thereof) Defendants gave regarding the tip credit it took and the tip pool it operated, and the untipped "sidework" that Defendants require servers to perform at less than minimum wage. Plaintiffs also seek to recover additional compensation they claim they were owed but did not receive in the form of mandatory service charges for private or larger events. Both Plaintiffs and Defendants seek summary judgment on two of the claims the Court certified under the FLSA and the IMWL: (1) the credit card offset fee claim (Plaintiffs only as to PSI, not the individual defendants,[2] and Defendants only as to liquidated damages, not liability); and (2) the sidework claim against each Defendant. R. 315. Defendants also seek summary judgment on Plaintiffs' claims concerning: (1) the notice Plaintiffs received pertaining to Defendants' use of a tip credit and tip pool (certified); (2) the allegation that Defendants impermissibly retained some of the tips in the tip pool to pay business and other expenses (not certified); and (3) breach of contract and unjust enrichment (not certified).

---

[2] Plaintiffs acknowledge that Pagnotta was not the general manager during the time period relevant to the credit card offset fee claim, and that although Cortes was, his deposition testimony raised issues of material fact that would preclude summary judgment against him. R. 315 at 2, n.3 (citing PSMF ¶¶ 6, 27).

## Analysis

The FLSA and IMWL require employers to pay their employees a minimum wage for each hour of work.[3] 29 U.S.C. § 206; 820 ILCS 105/4(a)(1). But an employer may offset its minimum wage obligations as to a tipped employee by the tips the employee actually receives. 29 U.S.C. § 203(m); 820 ILCS 105/4(a)(1), (c). This offset is known as a "tip credit." While generally an employer may only take a tip credit if each tipped employee retains all of his tips, 29 U.S.C. § 203(m); 820 ILCS § 105/4(c), this restriction does not apply if the employer operates a valid "tip pool." *Id.* In a tip pool, a portion of an employee's tips are redistributed to other employees who perform customer service functions, such as bussers, bartenders and food runners. *Id.* A tip pool is "valid" if it includes only employees who "customarily and regularly receive tips," and the employer does not "retain any of the employees' tips for any other purpose." 29 C.F.R. § 531.54; *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 380-81 (N.D. Ill. 2011); *Morgan v. SpeakEasy, LLC*, 625 F. Supp. 2d 632, 652-53 (N.D. Ill. 2007). If the tip pool is invalid—either because it includes employees who do not "customarily and regularly receive tips," or because the employer retains a portion of the tips for some other purpose—the employer may not take the tip credit, and must instead pay minimum wage. 29 U.S.C. § 203(m); *Williams-Green*, 277 F.R.D. at 379.

---

[3] The IMWL largely mirrors the FLSA, so except as otherwise provided below, the Court's analysis also applies to Plaintiffs' IMWL claims. *Deschepper v. Midwest Wine and Spirits, Inc.*, 2015 WL 1433230, at *7 (N.D. Ill. Mar. 26, 2015).

The FLSA also requires employers seeking to use a tip credit and/or tip pool to provide certain notice to affected employees. 29 U.S.C. § 203(m)(2)(A). The Department of Labor ("DOL") has promulgated regulations regarding that notice. One such regulation identifies information an employer must disclose to its tipped employees before using a tip credit, *id.* § 531.59(b), and another governs notice concerning tip pools, *id.* § 531.54. Yet another regulation addresses the type and amount of untipped work (so-called "sidework") for which an employer may utilize a tip credit. 29 C.F.R. § 531.56(e). Each such regulation is discussed in more detail below in the context of Plaintiffs' claims. The Court begins with the claims upon which both Plaintiffs and Defendants have moved for summary judgment.

## I.     Credit Card Offset Fee Claim

In their credit card offset fee claim, Plaintiffs contend that Defendants must be divested of the statutory tip credit because they improperly deducted more from their tips than was required to cover the costs of converting the tips to cash on a nightly basis while the policy was in place. *See* R. 121 ¶¶ 51, 56, 77-78, 135, 166. PRL had employed the same policy at its Texas restaurants since approximately 2003, deducting 3.25% from all credit card tips in an effort to recoup some of the costs associated with paying servers' tips out nightly as they had requested, including the actual fees charged directly by the credit card companies and cash delivery services, among other costs (such fee, the "offset fee," and such policy, the "offset fee policy"). R. 307 ¶¶ 4-5, 7-8; R. 334 ¶¶ 4-5, 7-8.

In 2004 and 2006, the Department of Labor investigated PRL for reasons unrelated to the offset fee policy. R. 307 ¶¶ 9-10; R. 334 ¶¶ 9-10. After the 2004 investigation, Mark Collins, PRL's then Chief Operating Officer, asked the DOL investigator, Chad Frazier, to examine its other policies. R. 307 ¶¶ 2, 11; R. 334 ¶¶ 2, 11. The parties dispute what transpired thereafter. According to Collins, Frazier told him that "everything about [PRL]'s handling of the tip pool and tip offsets was in order," and he was thus "under the impression that [PRL] was legitimately charging this [offset fee]." R. 313, Ex. 17 at 3. At this time, Richard Henderson, who ultimately became Collins' successor as COO, reported to Collins. R. 313, Ex. 16 at 1; R. 334 ¶ 3. According to Henderson, after Collins' meeting with Frazier, there was a "feeling that [PRL] wanted to go forward [with the offset fee policy] knowing that [it] was in compliance" with the FLSA. R. 334 ¶ 14. Yet in an April 2013 declaration, Frazier stated that he did "not remember the details of my conversation with [PRL] ownership, management, and/or legal counsel," but that "we probably discussed the credit card liquidation issue because it was such a rampant problem among Texas restaurants." R. 313, Ex. 17 ¶ 3. Frazier continued that at that time the "DoL Field Manual stated restaurants could charge their tipped employees no more than what the credit card companies charged the restaurant for liquidating credit card tips," and "[a]ny advice . . . I gave [PRL] . . . would have been consistent with the . . . Manual." *Id.* ¶ 4.

Ultimately, the offset fee policy gave rise to three lawsuits against Perry's related entities: *Steele v. Leasing Enterprises, Ltd.*, No. H-09-2789 (S.D. Tex.) in 2009

(the "Houston lawsuit"); *Hoenninger v. Leasing Enterprise, Ltd.*, No. 1:14-CV-798-LY (W.D. Tex.) in 2014 (the "Austin lawsuit"); and *Shaffer v. Perry's Restaurants, Ltd.*, No. SA-16-CV-01193-FB (W.D. Tex.) in 2016 (the "San Antonio lawsuit").[4]

The district court in the first-filed Houston lawsuit held in an August 2010 interlocutory order that the offset fee exceeded PRL's costs directly related to dealing in credit, pointing out that "[w]hile Perry's can use an average of discount rates to approximate the costs it incurs in converting credit-card tips, that amount cannot be a quarter to a half of a percent higher than the credit card with the highest discount rate." *Steele v. Leasing Enterprises, Ltd.*, 2010 WL 4027717, at *1-3 (S.D. Tex. Aug. 31, 2010). Nevertheless, PRL continued to employ its offset fee policy in Texas, and PSI implemented the policy at Perry's Oak Brook when it opened in November 2013. R. 307 ¶¶ 21, 24; R. 334 ¶¶ 21, 24. The parties dispute whether the policy was implemented at the request of PSI servers. R. 307 ¶ 24; R. 334 ¶ 24.

In the meantime, a bench trial was held in the Houston case in 2013. On August 19, 2014, the Houston court issued findings of fact and conclusions of law determining that the 3.25% offset fee policy violated the FLSA, but that the violation was not willful. R. 307, Ex. E at 3-4. Thereafter, PRL and PSI began to reorganize the payroll systems to eliminate the offset fee policy, including the nightly cashing out of credit card tips. R. 307 ¶ 25; R. 334 ¶ 25. The process was complete in mid-

---

[4] Because PRL was formerly known as Leasing Enterprises, Ltd., Leasing Enterprises, Ltd., rather than PRL, was named defendant in the Houston and Austin lawsuits. To avoid confusion, the Court refers to Leasing Enterprises, Ltd. as "PRL."

October 2014. After that, no server's credit card tips were cashed out nightly, or subjected to a credit card offset deduction. R. 307 ¶ 28; R. 334 ¶ 28.

Amended findings and conclusions issued by the Houston court in February 2015 reaffirmed that PRL's violation was not willful, and applied the good faith exception, precluding the recovery of liquidated damages. *Steele v. Perry's Restaurant, LLC*, 2015 WL 10438848, at *2-3 (S.D. Tex. Feb. 24, 2015). The Houston court stated that PRL was not barred from asserting the good faith defense simply because it had issued an interlocutory order indicating an FLSA violation and PRL had continued its policy thereafter. Rather, it was reasonable for PRL to "wait[ ] for a final judgment on an unsettled area of law before changing its practice." *Id.* at 3. The court found it compelling that PRL had consulted the DOL investigator, Frazier, about the policy in 2004, who found no issues. *Id.* The Fifth Circuit affirmed in June 2016, holding that the district court had not abused its discretion in denying liquidated damages, because the amount of the deduction exceeded the total credit issuer fees by less than 1%, and PRL "attempt[ed] to discover its compliance" through the 2004 DOL investigation. *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 247 (5th Cir. 2016). The Fifth Circuit also concluded that the district court's finding that the violation was not willful was not clear error, because the only evidence plaintiffs submitted was the continuation of the policy following the August 31, 2010 interlocutory order. *Id.* at 248.

Thereafter, in the later-filed Austin lawsuit, PRL stipulated that its offset fee policy violated the FLSA, but argued at the bench trial that its violation was in good

faith and not willful. The Austin court agreed, concluding that: (1) the only evidence suggesting willfulness was the Houston court's August 2010 *interlocutory* order; and (2) that PRL had established its good faith by seeking the DOL's advice in 2004. *Hoenninger v. Leasing Enterprises, Ltd.*, 2018 WL 6843709, at *3-5 (W.D. Tex. May 30, 2018). The Austin court held that it was reasonable for PRL to wait for a final judgment in the Houston lawsuit before making changes to its policy. *Id.* at *4-5.

Finally, the court in the San Antonio lawsuit granted PRL's motion for summary judgment on the offset fee policy as time-barred because it was filed outside the 2-year statute of limitations and there was no willful violation to extend that time. The court, in adopting the magistrate judge's report and recommendation, applied the same reasoning as the courts in the Houston and Austin lawsuits to conclude that the violation was not willful, holding that it was reasonable for PRL to await final judgment on the validity of its policy. *Shaffer v. Perry's Restaurants, Ltd.*, 2019 WL 2098115, at *1-2 (W.D. Tex. Feb. 12, 2019). The San Antonio court noted that the only new evidence suggesting that PRL knew that its offset fee policy was illegal was Frazier's declaration. *Id.* at *1. But the court found its contents "exceedingly vague and speculative" and therefore "not competent summary judgment evidence" because Frazier admitted that he did "not remember the details" of any conversation with a PRL representative, but that they "probably" discussed the offset fee. *Id.* at *1-2.

Here, Defendants all but concede that the offset fee policy violated the FLSA and IMWL, but argue that the viability of Plaintiffs' claim was affected by

Defendants' tender—and Plaintiffs' rejection of—a check purported to represent the difference between Plaintiffs' base hourly wage and minimum wage for all hours worked, as well as the 2% monthly penalty imposed by the IMWL ("offset fee tender").[5] Defendants also argue that any violation was not willful or in bad faith, as evidenced by the decisions in the Texas lawsuits. Accordingly, Defendants contend that the claim should be disposed of by agreement, and that liquidated damages should not apply. The Court first addresses the impact of the offset fee tender, before discussing the validity of the offset fee policy itself, and the issue of damages.

***Tender of partial payment.*** Defendants, citing *Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015), contend that Plaintiffs' refusal of the offset fee tender should "preclude Plaintiffs from continuing to sue on amounts not in dispute" and that Plaintiffs should suffer consequences for "rejecting a fully compensatory offer" because the offset fee tender resolved the base wages and IMWL 2% penalty interest due without the need for judicial assistance. R. 330 at 3. But nothing about *Chapman* suggests that Plaintiffs' claim was "mooted" or otherwise affected by Defendants' tender. In *Chapman*, the Court expressly held that a defendant's offer of full compensation does not render a case moot. 796 F.3d at 786-87. And there can be no doubt that Defendants' "offer" falls short of being fully compensatory. As Defendants acknowledge, the offset fee tender did not include attorneys' fees,[6] costs, or liquidated

---

[5] Effective February 19, 2019, the IMWL penalty increased to 5%. 820 ILCS 105/12.

[6] Defendants seem to suggest that it was inappropriate for Plaintiffs' counsel to decline the offset fee tender because it did not account for attorneys' fees. But the FLSA provides for such fees as of right to a prevailing plaintiff. 29 U.S.C. § 216(b) (providing that "[t]he court in such action shall, in addition to any judgment awarded

damages, and nor did it address the injunctive relief requested.[7] As such, the offset fee claim remains unaffected and properly before the Court. *See Chapman*, 796 F.3d at 786 ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.") (quoting *Knox v. Serv. Employees Int'l Union*, 567 U.S. 298, 307 (2012) (internal citations and quotations omitted)); *see also Chafin v. Chafin*, 568 U.S. 165, 172 (2013) ("As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.") (quoting *Knox*, 567 U.S. at 307-08 (internal citations and quotations omitted)).

Further, even if Defendants' tender had been fully compensatory, it still must be accompanied by an offer of judgment or settlement, and any such offer must be accepted, and, in the case of an FLSA collection action, approved by the Court. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 670 (2016) ("Under basic principles of contract law, [defendant's] settlement bid and Rule 68 offer of judgment, once rejected, had no continuing efficacy"); *see also In re AT&T Mobility Wireless Data Svcs. Sales Litig.*, 270 F.R.D. 330, 346 (N.D. Ill. 2010) ("Rule 23(e) 'requires court approval of any settlement that effects the dismissal of a class action' ") (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002)). But Defendants do not expressly acknowledge their violation, and have not extended such an offer, and nor has any settlement been submitted for approval. Accordingly, Plaintiffs'

---

to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.").

[7] Although Defendants argue that injunctive relief is unnecessary because the offset fee policy was terminated several years ago, Plaintiffs contend that Defendants' actions are capable of repetition.

offset fee claim was not impacted by Defendants' tender. *See Campbell-Ewald Co.*, 136 S. Ct. at 670-71 ("Having rejected Campbell's settlement bid, and given Campbell's continuing denial of liability," and "with no settlement offer still operative," the parties "retained the same stake in the litigation they had at the outset."). Defendants' argument fails.

*Liability.* Defendants do not dispute their liability because of their offset fee policy. But even if Defendants had, such an argument was doomed as to PSI under the doctrine of issue preclusion. Generally, issue preclusion applies to prevent parties from relitigating an issue where: "(1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). Here, the Houston lawsuit meets all the elements of issue preclusion. The validity of the offset fee policy was the "central subject" of the Houston lawsuit, was actually litigated, and was essential to the final judgment in that case. *Id.* And PSI, as a wholly-owned subsidiary of PRL, was fully represented in the Houston lawsuit, by the same attorneys who represent Defendants here. *See TRW, Inc. v. Ellipse Corp.*, 495 F.2d 314, 318 (7th Cir. 1974) (a wholly-owned subsidiary is in privity with its parent corporation for purposes of issue preclusion) (citing *Hart Steel Co. v. Railroad Supply Co.*, 244 U.S. 294 (1917)).

Further, even if issue preclusion were not applicable, the Court agrees with the Fifth Circuit that, consistent with a 2006 DOL opinion letter,[8] the offset fee policy violated the FLSA as a matter of law because it took into account the costs of "internal business decisions that were not required to collect credit card tips." *Steele*, 826 F.3d at 245. PSI's average overall cost of converting credit card tips to cash on a nightly basis was 2.4% of the credit card sales—less than the 3.25% deducted (3.5% in the case of a private event or larger party). R. 315 at 7; R. 329 ¶ 34. Accordingly, and Defendants offering no argument to the contrary, the Court concludes that PSI violated Section 203(m), because the offset fee exceeded the actual cost to PSI of converting Plaintiffs' credit card tips to cash. The Court thus grants Plaintiffs summary judgment on the issue of liability, divesting PSI of its statutory tip credit for the relevant time period. Defendants must also pay Plaintiffs the 2 percent penalty under the IMWL. 820 ILCS 105/12(a).

***Liquidated damages.*** Both Plaintiffs and Defendants seek summary judgment on the issue of liquidated damages. Under FLSA Sections 216(b) and 260, there is a presumption of double damages for a violation, absent a showing of good faith and reasonable belief that the employer was in compliance with the FLSA. *See Avitia v. Metro. Club of Chi., Inc.,* 49 F.3d 1219, 1223 (7th Cir.1995) ("Double damages

---

[8] That opinion letter distinguishes between "[t]he employer's deduction from tips for the cost imposed by the credit card company reflects a charge by an entity outside the relationship of employer and tipped employee" (as properly deducted) and "other costs that [an employer] wishes the tipped employees to bear" which are "normal administrative costs of [the employer's] restaurant operations" and therefore not appropriate for deduction. U.S. Dept. of Labor, Wage and Hour Div., Opinion Letter FLSA2006-1 (Jan. 13, 2006), 2006 WL 236427, at *2.

are the norm, single the exception.") (citation omitted). The burden to prove good faith and reasonableness is substantial and lies with the employer. *See Bankston v. Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995) ("An employer seeking to avoid the award of liquidated damages under the FLSA "bears a substantial burden in showing that it acted reasonably and with good faith."). The employer must take affirmative steps to ensure its FLSA compliance; it may not simply claim ignorance. *See Walton v. United Consumers Club*, 786 F.2d 303, 312 (7th Cir. 1986) ("A good heart but empty head does not produce a defense"); *see also Paulitz v. City of Naperville*, 874 F. Supp. 834, 834 (N.D. Ill. 1994) ("Failure to take affirmative action to ascertain the [FLSA]'s requirements precludes a finding of reasonable good faith.").

The parties vigorously debate whether Defendants' actions with respect to the implementation and maintenance of the offset fee policy were in good faith within the meaning of the FLSA. Defendants point to the courts' reasoning in the Texas lawsuits holding that they were, given PRL's inquiry to the DOL investigator in 2004, and that the Houston court's August 2010 decision was merely an interlocutory order in an unsettled area of law. But unlike in the Texas lawsuits, PSI did not merely maintain the offset fee policy at Perry's Oak Brook following the August 2010 Houston order. Instead, it *established* the policy at a new store in a new state. *Cf. Steele*, 2015 WL 10438848, at *3 ("Bad faith cannot be imputed to Perry's for a judgment that occurred after the fee system was established."). And PSI has not presented any evidence that it conducted an analysis or other investigation prior to implementing that policy to determine whether an offset fee less than 3.25% would be feasible, or that it complied

with Illinois law. At a certain point PRL's 2004 inquiry with a DOL representative can no longer save it from liquidated damages (even assuming that inquiry satisfied PRL that its offset fee policy was lawful, which Plaintiffs dispute). That point is now. Because PSI presents no evidence of any inquiry after the Houston court's August 2010 interlocutory ruling and before implementing that same policy at Perry's Oak Brook in 2013, or that it investigated whether that policy complied with Illinois law,[9] R. 329 ¶ 43, PSI has not demonstrated any "affirmative step" taken to ensure compliance as required to meet its substantial burden to demonstrate good faith and overcome the presumption of liquidated damages. *See Dominici v. Bd. of Ed. of City of Chi.*, 881 F. Supp. 315, 322 (N.D. Ill. 1995) ("For an employer to establish it had objectively reasonable grounds for believing its actions did not violate the FLSA, it must establish that it took affirmative steps to determine FLSA requirements but, nevertheless, violated the FLSA."). Accordingly, the Court grants Plaintiffs' motion for such damages. *Bankston*, 60 F.3d at 1254.

**Willfulness.** Plaintiffs also argue that Defendants' violation was willful, and thus that the Court should deny Defendants' motion for summary judgment on that issue. For willful violations, a three-year—rather than the default two-year—statute

---

[9] Defendants argue that because the Illinois Administrative Code provides that the IMWL should be interpreted in accordance with the FLSA, "there was no indication that Illinois Law established a different legal doctrine concerning credit card fees," and thus that no further inquiry was required because "at the time of the origination of the credit card offset fee policy by PSI, the law about credit card offset fees was unsettled. R. 329 ¶ 43. The Court disagrees. The mere fact that the IMWL may be interpreted consistently with the FLSA on these matters does not excuse Defendants' failure to confirm that fact.

of limitations applies. 29 U.S.C. § 255(a). But Plaintiffs bear the burden of establishing willfulness, *Caraballo v. City of Chi.*, 969 F. Supp. 2d 1008, 1024 (N.D. Ill. 2013), and to do so, they must show that Defendants "either knew [they] were violating the [FLSA] or [were] indifferent to whether [they were] violating it or not (and therefore 'reckless')." *EEOC v. Madison Cmty. Unit School Dist. No. 12*, 818 F. 2d 577, 585 (7th Cir. 1987)). Here, to establish Defendants' willfulness, Plaintiffs rely on the same arguments they made to demonstrate their right to liquidated damages, arguing that the Court "should have no problem finding Defendant PSI's conduct willful" on those facts. R. 315 at 16. This question is one for the jury. *See Tomeo v. W&E Communications, Inc.*, 2016 WL 8711483, at *13 (N.D. Ill. Sep. 30, 2016) ("whether Defendants' inquiry was adequate such that their violations were not willful is a question of fact. It therefore cannot be resolved on summary judgment.") (internal citations omitted); *see also Caraballo*, 969 F. Supp. 2d at 1025 ("whether an employer has acted willfully is a question of fact"). Consequently, the Court denies the parties' motions on this issue.

## II.  **Sidework Claim**

Both Plaintiffs and Defendants also seek summary judgment on Plaintiffs' sidework claim, which is based upon what is known as the "80/20 rule" (explained below). Plainiffs seeks compensation at the minimum wage rate of $8.25 per hour— rather than at the Illinois tip credit rate of $4.95 per hour plus tips—for their untipped sidework. Plaintiffs' motion is founded upon what they contend is indisputable evidence that their opening and closing sidework exceeded 20% of their

workweek.[10] Defendants, on the other hand, argue that the DOL eliminated the possibility of such a claim through its November 8, 2018 opinion letter (the "DOL Opinion Letter") and revised Field Operation Handbook ("Revised Handbook"). The Court begins with some background information before addressing the parties' arguments.

*Background.* As discussed, an employer generally may utilize the tips of a tipped employee to meet its minimum wage obligations under certain circumstances. But the FLSA does not explain how this tip credit applies to an employee who performs both tipped and untipped work. Accordingly, the DOL promulgated what has become known as the "dual jobs regulation," which provides that where the employee maintains dual job duties, the employer must pay a standard minimum wage for those duties for which the employee does not receive a tip. 29 C.F.R. § 531.56(e). That regulation specifically provides that a tipped employee:

> employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter, . . . is a tipped employee only with respect to his employment as a waiter. . . . [N]o tip credit can be taken for his hours of employment in his occupation of maintenance man.

*Id.* The regulation distinguishes a dual job (or "unrelated" duties) from:

> a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. . . . Such related duties . . . need not by themselves be directed toward producing tips.

---

[10] Plaintiffs expressly do not seek compensation for sidework performed while guests are present (i.e. "running" sidework). R. 333 at 19.

*Id.* Thus, an employer can take a tip credit (and need not pay minimum wage) for an employee who performs "related" but non-tipped duties provided that the employee performs them only "occasionally" or "part of [the] time." *Id.*; *see also Schaefer v. Walker Bros. Enterprises, Inc.*, 829 F.3d 551, 554 (7th Cir. 2016). But the dual jobs regulation does not explain those terms.

In its 1988 Field Operation Handbook (the "1988 Handbook")—in effect when this lawsuit was filed on October 29, 2014 and through the June 1, 2018 opt-in/opt-out date—the DOL indicated that if an employee spent "in excess of 20 percent" of his time on untipped work, that work was performed more than "occasionally," and thus "no tip credit may be taken." U.S. Dep't of Labor, Wage & Hour Div., 1988 Handbook § 30d00(e) (Dec. 9, 1988). For 30 years thereafter, courts interpreted this provision to require employers to pay tipped employees who spend more than 20% of their time performing related duties the regular minimum wage for that time. *See, e.g.*, *Driver v. AppleIllinois, LLC*, 739 F.3d 1073, 1076 (7th Cir. 2014) ("A tipped employee is entitled just to the sub-minimum, tip credit wage rate unless he is doing either unrelated non-tipped work or related non-tipped work in excess of 20 percent of his work-day."); *Marsh v. J. Alexander's LLC*, 905 F.3d 610, 628-29, 633 (9th Cir. 2018) (*en banc*) (same); *Fast v. Applebee's Int'l, Inc.*, 628 F.3d 872, 879-80 (8th Cir. 2011), *cert. denied*, 565 U.S. 1156 (2012) (same). The DOL reaffirmed this interpretation through its submission of amicus briefs before the Eighth, Ninth and Tenth Circuit Courts of Appeals in the aforementioned cases cited, and by republishing it in 2016 edits to the 1988 Handbook.

But in November 2018, the DOL issued an opinion letter purporting to abolish the limitation on "the amount of duties related to tip-producing occupation that may be performed" so long as such related duties were performed "contemporaneously" or within "a reasonable time" before or after "direct-service duties." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA 2018-27 (Nov. 8, 2018), 2018 WL 5921455, at *2-3. By its terms, the DOL Opinion Letter superseded the statements to the contrary in the 1988 Handbook. *Id.* at *2.

Then, in February 2019, the DOL issued the Revised Handbook, reaffirming that the "dual jobs" regulation "permits the employer to take a tip credit for *any time* the employee spends performing duties related to the tipped occupation, even though such duties are not themselves directed toward producing tips." U.S. Dep't of Labor, Wage & Hour Div., Revised Handbook § 30d00(f)(2) (Feb. 15, 2019) (emphasis added). The DOL contemporaneously issued a Field Assistance Bulletin stating that employers are no longer prohibited "from taking a tip credit based on the amount of time an employee spends performing duties related to a tip-producing occupation" if "performed contemporaneously with direct customer service duties or for a reasonable time immediately before or after" such duties.[11]

***The viability of the 80/20 rule.*** Despite these pronouncements, Defendants fail to cite a single case in which a court has followed the DOL's new interpretation of the 80/20 rule. The Court located one, *Schaffer v. Perry's Restaurants, Ltd.*, 2019

---

[11] Field Assistance Bulletin No. 2019-2 (Feb. 15, 2019), available at https://www.dol.gov/whd/FieldBulletins/fab2019_2.htm (last visited Dec. 17, 2019).

WL 2098116 (W.D. Tex. Apr. 24, 2019), but that decision—which dismissed the plaintiffs' sidework claims to the extent founded on the 80/20 rule—resulted from the plaintiffs' failure to object to the magistrate judge's report and recommendation, and is now the subject of a motion to reconsider. In any case, the Court is persuaded by the several cases that have declined to defer to the new interpretation.

Courts typically grant an agency "significant leeway" to explain "what its own rules mean." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019). As such, an agency interpreting its own ambiguous regulation is generally granted "*Auer* deference," pursuant to which courts follow the interpretation unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). But a court need not give an agency interpretation *Auer* deference when it amounts to an about-face on a previous, longstanding position, creating "unfair surprise." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). *Auer* deference under such circumstances is rare. *Kisor*, 139 S. Ct. at 2418.

Here, and without warning, the DOL's new interpretation directly contradicts the 80/20 rule adopted over 30 years ago, causing unfair surprise. *Christopher*, 567 U.S. at 156. The interpretation also contradicts the dual jobs regulation, which, as noted, describes "related duties" as work performed "occasionally" and "part of [the] time," 29 U.S.C. § 531.56(e), thus demonstrating an intent to impose *some* limitation on the amount of time an employer can take advantage of a tip credit when an employee performs such duties. Further, the DOL's new interpretation runs contrary

to the remedial purpose of the FLSA—to ensure a fair minimum wage. *See Flores v. HMS Host Corp.*, 2019 WL 5454647, at *5 (D. Md. Oct. 23, 2019) ("If . . . no quantitative limits exist on an employer's imposition of "related" but untipped duties, then employees could be deprived of the regular minimum wage even if only a fraction of the employee duties were tipped."). *Auer* deference is not appropriate here.

Short of *Auer* deference, courts give "*Skidmore* deference" to the extent an agency interpretation has "the power to persuade." *Mendoza v. Sessions*, 891 F.3d 672, 676 (7th Cir. 2018) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)); *Bailey v. Pregis Innovative Packaging, Inc.*, 600 F.3d 748, 751 (7th Cir. 2010). An agency interpretation's persuasiveness depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140. But neither the Revised Handbook nor the DOL Opinion Letter are sufficiently persuasive to warrant *Skidmore* deference. As shown, the DOL's new interpretation runs contrary to the regulation's plain language and how it had been interpreted and applied for years, including by the Seventh Circuit. Nor is there evidence of thorough consideration or well-reasoned decision-making prior to or even after the DOL's interpretation changed. *See Spencer v. Macado's, Inc.*, 2019 WL 2931304, at *6 (W.D. Vir. Jul. 8, 2019) (*Skidmore* deference inappropriate in part because the timing of the new interpretation of the dual jobs regulation "suggests political motivations rather than any genuine interpretive change," and because the DOL "offered no 'evidence of any thorough

consideration for reversing course' on the twenty percent rule" (quoting *Cope v. Let's Eat Out, Inc.*, 354 F. Supp. 3d 976, 986 (W.D. Mo. Jan. 2, 2019)). Accordingly, this Court concludes that the DOL's new interpretation is due no deference, consistent with *Esry v. P.F. Chang's China Bistro, Inc.*, 373 F. Supp. 3d 1205 (E.D. Ark. 2019), *Cope v. Let's Eat Out, Inc.*, 354 F. Supp. 3d 976 (W.D. Mo. Jan. 2, 2019), *Spencer v. Macado's, Inc.*, 2019 WL 2931304 (W.D. Vir. July 8, 2019), *Belt v. P.F. Chang's China Bistro, Inc.*, 2019 WL 3829459 (E.D. Penn. Aug. 15, 2019), and *Flores v. HMS Host Corp.*, 2019 WL 5454647 (D. Md. Oct. 23, 2019).

Further, although the 80/20 rule is no longer binding because the 1988 Handbook upon which it was based was revised to eliminate it, the Court agrees with those courts that have held that the rule is nevertheless a reasonable interpretation of the dual jobs regulation and went on to apply it anyway. As noted, the regulation's plain language "places a temporal limit on the amount of untipped related work an employee can perform before they become engaged in 'dual jobs.' " *Belt*, 2019 WL 3829459 at *17; *see also Spencer*, 2019 WL 2931304 at *7 (holding that the 80/20 rule is "an eminently reasonable interpretation of the regulation"); *Esry*, 373 F. Supp. 3d at 1211 (same). And 20 percent or less is a reasonable interpretation of "occasionally" or "part of [the] time." *Belt*, 2019 WL 3829459, at *17.

***Retroactive application of the DOL's new interpretation.*** Although the Court need not address whether the DOL's new interpretation of the dual jobs regulation applies to this litigation because it has found it unworthy of deference, even if it did give that interpretation deference, it would not apply here. *See Cope*,

354 F. Supp. 3d at 986 ("Because the Court finds the Opinion Letter to be unworthy of deference, the Court need not address whether the Opinion Letter applies to pending litigation."). An administrative agency may not promulgate retroactive rules unless: (1) "Congress has provided the agency with express authority to do so;" and (2) "the agency uses language in the rule expressly requiring" retroactive application. *Beller v. Health & Hosp. Corp.*, 703 F.3d 388, 391 (7th Cir. 2012); *see also Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001) ("If an agency promulgates a new rule that changes the substantive state of existing law, that rule is not retroactive unless Congress expressly authorized."). The Court is not aware of any Congressional authorization for retroactive application of the DOL's new interpretation. Nor did the DOL use language requiring retroactive application here. The DOL Opinion Letter states that the DOL's new interpretation was "*from today* [November 8, 2018] *forward.*" DOL Opinion Letter, 2018 WL 5921455, at *1 (emphasis added). And the Field Assistance Bulletin indicates only that the new interpretation should be followed by "WHD staff . . . in *any open or new investigation* concerning work performed prior to the issuance of [the DOL Opinion Letter]."[12] There is no evidence that an "investigation" of Defendants' sidework policy was ever pending before the DOL. The Court rejects Defendants' argument that Plaintiffs' sidework claim fails as a matter of law.

---

[12] Field Assistance Bulletin No. 2019-2 (Feb. 15, 2019), available at https://www.dol.gov/whd/FieldBulletins/fab2019_2.htm (last visited Dec. 17, 2019) (emphasis added).

***Whether Plaintiffs spent 20% of their time on related, untipped work.***

But even as the Court upholds the viability of the 80/20 rule, summary judgment for Plaintiffs is not proper absent undisputed evidence that Plaintiffs: (1) spent in excess of 20 percent of their work time on related, but non-tipped work; or (2) performed unrelated non-tipped work (which is not subject to the 20 percent threshold). *Driver*, 739 F.3d at 1076. While Plaintiffs contend that many of the duties they performed are "arguably" unrelated to a server's tipped duties, they do not meaningfully argue that they performed unrelated work. *See* R. 315 at 21 (listing among other things carrying chairs and "wrought iron table bases with large wooden table tops," washing and sanitizing serving trays and wooden porkchop plates, distributing glasses and plates, and dusting and washing table legs and bases as "arguably" unrelated duties Plaintiffs performed, but citing no case law). Instead, Plaintiffs focus on demonstrating that their non-tipped work exceeded the 20 percent threshold applicable to related work.[13] *See* R. 315 at 21 (indicating that "whether the work is 'unrelated' or 'related' will hardly matter since the amount of time spent on opening and closing 'sidework' is hardly 'incidental.' ").

---

[13] The Court notes that the Seventh Circuit in *Schaefer* seemed to acknowledge a *de minimus* defense for unrelated work, concluding that if such work is infrequent and "negligible," pay need not be recalculated at the minimum wage rate for that work. 829 F.3d at 555 (concluding that the most "problematic," or "unrelated" tasks included "wiping down burners and dusting picture frames," but that those tasks took only a "negligible" amount of time, and "much less than 20%"); *see also Grosscup v. KPW Mgmt., Inc.*, 261 F. Supp. 3d 867, 872 n.3 (N.D. Ill. 2017) (recognizing that *Schaefer* may have allowed a *de minimus* defense for non-tipped work that is unrelated to the occupation). But because Plaintiffs focus on the total time expended on non-tipped tasks, the Court declines to address whether or how this defense applies on these facts at this juncture.

There is no dispute that Plaintiffs performed a variety of tasks in addition to taking customers' orders, delivering their food, and other tipped work. By way of example, Plaintiffs were assigned duties set forth in opening and closing lists, including cutting lemon slices, stocking milk and cream, and polishing knives. R. 313 ¶ 61; R. 329 ¶ 61; R. 313, Ex. 32 and 33. But servers shared responsibility for sidework and no single server was ever tasked with all of the duties on these lists. The record also reflects that the amount and percentage of time a server spent performing non-tipped duties was greater if he was assigned the role of "opener" or "closer," both of which entailed additional responsibility, including assigning sidework to fellow servers, and checking their work. It is also clear that shift lengths varied. Yet Plaintiffs contend that the evidence indisputably demonstrates that across the board, opening sidework alone constituted more than 20 percent of a given server's shift. In support, Plaintiffs cite deposition testimony and declarations from 13 servers which together indicate that opening and closing sidework each spanned anywhere from 30 minutes to 2 hours. *See, e.g.*, R. 313, Ex. 40 ¶ 60 (Sandra Bader declaration indicating that opening and closing sidework each took 30 minutes to an hour); R. 313, Ex. 57 at 112-13, 130-31 (Carlos Gordoa deposition excerpt indicating that he had about 2 hours of opening sidework and 1.5 to 2 hours of closing sidework "every single day that I worked there"). Plaintiffs also point out that defendant Pagnotta acknowledged that the average time spent on opening sidework is 30 minutes, and that the average closing takes between 30 and 45 minutes. R. 313 ¶ 65; R. 329 ¶ 65. But Defendants present the deposition testimony of two servers—Rudy De Reza, who is a class

member, and Stephen Pottle, who has opted out—indicating that opening and closing sidework each took servers just 15 to 30 minutes per shift, "well below . . . 20% of their work time during 6-8 hour shifts." R. 330 at 14; R. 329, Ex. Z-2 at 26 (De Reza deposition excerpt stating that 15 to 20 minutes "is what the sidework kind of takes, sometimes 30 minutes, but that's more or less"); R. 329, Ex. Y-1 at 95 (Pottle deposition excerpt in which he states that opening sidework took "15 minutes to half an hour" on average).

Plaintiffs contend that the Court need not rely solely on these "subjective estimates," R. 315 at 24, submitting an excel spreadsheet which Plaintiffs argue proves that servers spent an average of 28.05% of their working time on opening sidework alone. R. 315 at 25. That spreadsheet sets forth, by shift for each server scheduled from October 2014 through mid-March 2018, the time clocked in and out, total hours worked, and time assigned tables. According to Plaintiffs, the amount of a server's opening sidework for a given day can be determined by comparing the server's clock-in time with the time he received his first table. R. 315 at 25.

But Plaintiffs' position necessarily depends on its assertion that servers were constantly working. And while they support that assertion with deposition testimony, R. 313 ¶¶ 68-69, Defendants point to testimony indicating that servers had time to stand around and socialize while waiting for patrons. R. 330 at 14; R. 329, Ex. Y-1 at 95 (Pottle deposition testimony indicating that other servers took more than 15 to 30 minutes to complete their opening sidework because "[t]hey tend to socialize and talk among themselves and wait to start their things"). The only argument Plaintiffs offer

in response is that under the "continuous workday rule," *any* time spent on something other than tipped duties should factor into the 80/20 calculus—even if servers were performing no duties at all. R. 343 at 13-14 (stating that "[i]t would be fanciful to state that standing around or socializing with other co-workers generates tips"). The Court is dubious. The "continuous workday rule" simply provides that generally, an employee must be compensated for the period between the commencement and completion of his principal activities on the same workday. The dispute here is not whether Plaintiffs should have been compensated when they weren't. Instead, the issue is whether Plaintiffs should have been compensated differently due to excessive related but non-tipped *work*. Plaintiffs cite no authority suggesting that standing around or socializing counts as such related work. And that makes sense; to hold otherwise would mean that *any* downtime would be subject to the "related work" calculus, even though such activity is not "work" at all. *See Driver*, 739 F.3d at 1076 ("A tipped employee is entitled just to the sub-minimum, tip credit wage rate *unless* he is doing either unrelated non-tipped work or related non-tipped work in excess of 20 percent of his work-day.") (emphasis added). Plaintiffs submit no other evidence representing the actual time Plaintiffs spent on opening and closing sidework. Accordingly, genuine issues of material fact remain, and the cross motions for summary judgment on the sidework claim are denied.

## III.    Notice Claim

Plaintiffs also claim that they were not provided proper notice of the tip credit and tip pool structure employed by Defendants in violation of Section 203(m) of the

FLSA.[14] R. 121 ¶¶ 93-111, 138. Defendants seek summary judgment on Plaintiffs' notice claim, contending that the notice provided to Plaintiffs was sufficient under *Schaefer v. Walker Brothers Enterprises, Inc.*, 829 F.3d 551 (7th Cir. 2016), as a matter of law. R. 308 at 18. In *Schaefer*, the court held that employers need only provide employees advance notice: (1) that in anticipation of tips, the employer will pay less than the minimum wage; (2) of how much the cash wage will fall short of the minimum wage; and (3) that if tips plus the cash wage do not at least match the minimum wage, the employer will make up the difference. *See Schaefer*, 829 F.3d at 556-57 (listing these as the items "apt to matter most to employees"). In so doing, the court questioned whether Section 203(m) required an employer operating a tip pool to inform workers that they could keep non-pooled tips. *See Schaefer*, 829 F.3d at 556-58 (noting that "[t]he structure of the statutory language is that workers be informed of the rules *and* that they keep non-pooled tips. That's a strange way to require workers to be informed *that* they keep all tips," and that "the statute on its own does not necessarily call for" such notification). And the court did not address tip pool notification at all. But a tip pool was not before the court in *Schaefer*, and the court expressly did not consider the DOL regulations regarding notice because they had not yet been promulgated during the time period at issue.[15] *See Schaefer*, 829 F.3d at 558 (declining to apply notice regulation because "regulatory changes are not retroactive") (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1998)).

---

[14] As Plaintiffs acknowledged when they moved for partial class and collective action certification, the IMWL does not contain a similar notice provision.

[15] Of note, neither did Defendants here.

Those regulations—promulgated in May 2011 and applicable here—require an employer to inform tipped employees in advance of using a tip credit: (1) of the amount of the cash wage to be paid; (2) of the amount of the tip credit claimed (which may not exceed the value of tips actually received); (3) that all tips received must be retained by the employee except in the case of a valid tip pool; and (4) that the tip credit cannot be used if the employee is not informed of these requirements. 29 C.F.R. § 531.59(b).[16] And 29 C.F.R. § 531.54 requires an employer to notify employees of the amount of any tip pool contribution.

With that in mind, the Court examines the three ways in which Defendants contend that notice was provided, recognizing that notice obligations may be satisfied through a combination of materials or conversations: (1) posters explaining the FLSA and relevant Illinois laws; (2) checkout reports provided to servers after each shift; and (3) verbally, including during server interviews and training. R. 308 at 17-18; R. 342 at 21-22; R. 307 ¶¶ 68-73; *Schaefer*, 829 F.3d at 558 ("§ 203(m) does not say that all of the information must be in a single document").

---

[16] 29 C.F.R. § 531.59(b) provides in relevant part:

> The amount of the cash wage that is to be paid to the tipped employee by the employer; the additional amount by which the wages of the tipped employee are increased on account of the tip credit claimed by the employer, which amount may not exceed the value of the tips actually received by the employee; that all tips received by the tipped employee must be retained by the employee except for a valid tip pooling arrangement limited to employees who customarily and regularly receive tips; and that the tip credit shall not apply to an employee who has not been informed of these requirements in this section.

***Posters.*** Defendants displayed a DOL poster at all relevant times that set forth the minimum wage and, with respect to tip credits, stated:

> Employers of "tipped employees" must pay a cash wage of at least $2.13 per hour if they claim a tip credit against their minimum wage obligation. If an employee's tips combined with the employer's cash wage of at least $2.13 per hour do not equal the minimum hourly wage, the employer must make up the difference. Certain other conditions must also be met.

R. 334, Ex. 61 at 1. Defendants also displayed an Illinois Department of Labor ("IDOL") poster providing the minimum wage and that:

> [Tipped employees] must be paid at least 60% of the applicable minimum wage. If an employee's tips combined with the wages from the employer do not equal the minimum wage, the employer must make up the difference.

*Id.* at 2, 3. These posters explain how a tip credit works, but do not satisfy Defendants' notice obligations under Section 203(m). *See Driver v. AppleIllinois,* LLC, 917 F. Supp. 2d 793, 802 (N.D. Ill. 2013) ("The text of those [DOL and IDOL] posters alone cannot comply" with FLSA notice obligations). They do not indicate whether a tip credit will be claimed at all, let alone the amount of the cash wage the servers could expect to receive or the amount of the tip credit claimed. *See id.* at 803 ("case law . . . has consistently required the employer to inform the employee that it will, in fact, use tips as a credit against its minimum wage obligation"); *see also Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 289-90 (S.D.N.Y. 2011) ("A generic government poster . . . could not possibly inform employees that their employers intend to take the tip credit"). Nor do they explain that all tips received must be retained by the employee except in the case of a valid tip pool, the amount of the tip

pool contribution, or that a tip credit cannot be used if the employee is not informed of these requirements. Further, while Pagnotta swore in an affidavit that PSI always displayed "a poster informing [servers] of all of their rights under the Fair Labor Standards Act and Illinois law, including their rights concerning their tips and the way in which the tip pool operated," that testimony is refuted by the posters themselves. *Compare* R. 307, Ex. I at 3 (Pagnotta affidavit) *with* R. 334, Ex. 61 (posters). The posters alone do not suffice.

***Checkout reports.*** Defendants next argue that servers were provided with "precise information" about Defendants' tip pool structure and procedure, citing certain Plaintiffs' deposition testimony describing the tip pool procedure and contribution amount as they relate to checkout reports generated by Defendants' POS system and provided to servers at the end of a shift. R. 307 ¶¶ 61, 69; R. 308 at 18. But that testimony does not establish that Defendants provided the information in advance; in fact, it supports the opposite conclusion. *See, e.g.*, R. 307, Ex. K-11 at 1-5 (Berger deposition excerpts walking through a sample checkout report in which Berger explained that she knew she had to contribute 4.5% of her nightly sales to the tip pool because of "simple math"); *see also* R. 307, Ex. K-11 at 6-7 (Rendak deposition excerpts explaining how checkout reports were generated and what he understood walking out with one after his first day). Unlike 29 C.F.R. § 531.59, however, the Court does not read 29 C.F.R. § 531.54 to require advance notification of the tip pool contribution amount. *See* 29 C.F.R. § 531.54 (stating only that "an employer must notify its employees of any required tip pool contribution amount"); *see also Perez v.*

*Over-Easy, Inc.*, 2019 WL 5101606, at *3 (N.D. Ill. Oct. 9, 2019) (29 C.F.R. § 531.54 "does not require an employer to provide [the] notification in advance of the employee's first day."). Nevertheless, the checkout report testimony does not establish that Defendants even "informed" Plaintiffs of the tip pool contribution (let alone that they had a right to keep all tips not subject to the tip pool, that the tip credit could not be used without notice of the tip credit requirements, or that the servers understood in advance that Defendants intended to take a tip credit as required by 29 C.F.R. § 531.59). Accordingly, the reports and related testimony are insufficient—both alone and in combination with the posters—to satisfy Defendants' notice obligations and grant summary judgment for Defendants.

***Verbal conversations with management.*** Finally, Defendants point to information given to servers about the tip pool and tip credit during their interviews and training. Defendants rely on three Plaintiffs—Jay Anich, Sandra Bader, and Timothy Rendak—who admitted during their depositions to having been given some information about the tip credit and/or tip pool contribution and procedure. But none of the evidence cited covered all of the notice requirements, and nor was it clear in all cases that the notice required to be given in advance was. *See* R. 307, Ex. K-12 at 1-2 (Anich deposition excerpts indicating only that Anich knew prior to Perry's Oak Brook's opening—likely from discussions with management—that 4.5% of his total sales would be contributed to a tip pool and that he would be paid partly in a cash wage, and partly through tips); *see also id.* at 3-4 (Bader deposition excerpts indicating that she understood from her interview that she would be required to

contribute to a tip pool but did not know the exact amount, and also had been told by management—"possibly" from the beginning—that tips were hers to keep less her tip pool contribution); *id.* at 5-6 (Rendak deposition excerpts indicating that management explained the tip pool contribution in connection with a checkout report, and that it would be distributed among certain eligible employees, but not stating when the explanation occurred or anything about the tip credit). Further, record evidence makes clear that different servers had different recollections about whether (and if so, what) advance notice was provided.[17] *See, e.g.*, R. 313, Ex. 37 ¶¶ 22-24 (Berger declaration indicating that she was never told that the tip credit claimed could not exceed the amount of tips received, or that she had a right to retain all tips except those contributed to a tip pool); *see also* R. 313, Ex. 38 ¶¶ 13-15 (Krystle Burgess declaration saying the same); R. 313, Ex. 39 ¶¶ 15-17 (Cheri Castaldo declaration saying the same, and that although she was told about a tip pool contribution, she was not informed that a "valid tip pool was limited to employees who customarily and regularly received tips"). Accordingly, genuine issues of material fact remain for trial, and Defendants' motion is denied as to the notice claim.

---

[17] In fact, Mr. Anich's deposition testimony on August 8, 2018 contradicts his April 12, 2016 declaration. *Compare* R. 307, Ex. K-12 at 1 (deposition testimony indicating that Anich knew about the tip pool contribution before starting and that tips would be distributed only among "employees who customarily and regularly received tips, like bussers and runners and bartenders") *with* R. 313, Ex. 36 at 3 (declaration indicating that "Perry's did not advise me that a valid tip pool was limited to employees who customarily and regularly received tips").

## IV.    Tip Pool Claim

Defendants also moved for summary judgment on Plaintiffs' tip pool claim, in which Plaintiffs contend that Defendants unlawfully retained tips "for the house" in violation of 29 C.F.R. § 531.54 instead of distributing them to PSI's tip pool participants. R. 121 ¶¶ 2, 59, 75-76, 134, 165.

It is undisputed that 4.5% of a Perry's Oak Brook server's total sales were designated as a "tip share" contribution to a tip pool in which servers shared tips with bussers, food runners, hostesses and bartenders ("PSI tip pool participants"). R. 307 ¶¶ 50-51, 54-55; R. 334 ¶¶ 50-51, 54-55. It is likewise undisputed that PSI tip pool participants were guaranteed a specific minimum hourly wage for hours worked ("base wage").[18] R. 307 ¶ 53; R. 334 ¶ 53. Tip pool proceeds were then distributed to eligible recipients at the end of each pay period on a pro rata basis. R. 307 ¶ 56; R. 334 ¶ 56. To the extent the tip pool contributions were insufficient to compensate PSI tip pool participants at their base wages, PSI made up the difference. R. 307 ¶¶ 56, 58; R. 334 ¶¶ 56, 58. And if the contributions exceeded the PSI tip pool participants' base wage, the excess compensation was distributed among them on a pro rata basis. R. 307 ¶¶ 56, 59; R. 334 ¶¶ 56, 59.

But in a single pay period in December 2014, Defendants failed to pay out $504.93 in tip pool proceeds to PSI tip pool participants. R. 334 ¶ 56; R. 342, Ex. KK at 1. Defendants submit the declaration of PSI's comptroller, Derek Pearson,

---

[18] By way of example, PSI hostesses were paid a guaranteed base wage of $12.00/hour. *Id.*

indicating that instead, those proceeds were incorrectly recorded as a tip share contribution for a different restaurant, and distributed to the tip pool participants there. R. 342, Ex. KK at 2. Pearson explained that the lesser tip share contribution that should have been recorded at the other restaurant was incorrectly recorded as that for the PSI tip pool participants. *Id.* Upon realizing the error, PSI made up the difference, ensuring that PSI tip pool participants received the full $504.93 distribution that they would have but for the initial error. *Id.* Plaintiffs offer no evidence to the contrary or of any other similar instance. Thus, because PSI did not keep any portion of the tip pool, the Court grants Defendants summary judgment on Plaintiffs' tip pool claim.

## V. Common Law Claims for Breach of Contract and Unjust Enrichment

Defendants also move for summary judgment on Plaintiffs' common law unjust enrichment and breach of contract claims against PSI, arguing that both are preempted by the FLSA. Courts in this Circuit have routinely held that the FLSA preempts common law claims based on the same set of facts as an FLSA claim. *See, e.g.*, *Deschepper*, 2015 WL 1433230, at *8 ("To the extent that a plaintiff asserts that an employer wrongfully withheld compensation in violation of state common law based on the same factual allegations supporting an FLSA claim, her state law claim is preempted."); *Farmer v. DirectSat USA, LLC*, 2010 WL 3927640, at *14 (N.D. Ill. Oct. 4, 2010) ("Defendants contend that Plaintiffs' claims for unjust enrichment, quantum meruit, and breach of implied contract are 'squarely based on rights established by the FLSA' and therefore preempted by FLSA's remedial scheme. The

Court agrees."). Further, "if all that is sought in a state law . . . unjust enrichment claim is unpaid overtime compensation or minimum wages that are guaranteed by the FLSA, those state law claims are preempted." *Nicholson v. UTi Worldwide, Inc.*, 2010 WL 551551 at *6 (S.D. Ill. Feb. 12, 2010). However, there is no preemption where the common law claim seeks "something other than what the FLSA can provide." *Raimondi v. Cent. DuPage Hosp.*, 2017 WL 1178513, at *7 (N.D. Ill. Mar. 30, 2017) (quoting *Nicholson*, 2010 WL 551551, *6).

Here, in both Count IV and V (Plaintiffs' breach of contract and unjust enrichment claims, respectively), as in Count I (Plaintiff's FLSA claim), Plaintiffs seek to recover from PSI's failure to pay minimum wage and unlawful retention of tips. Such an action is covered by the FLSA, so Counts IV and V are preempted to that extent. *See Morgan*, 625 F. Supp. 2d at 659 ("The FLSA clearly addresses the situation where an employer fails to pay minimum wages to an employee and/or unlawfully retains tips from a tip pool." (citing 29 U.S.C. §§ 203(m), 206(a)(1)); *see also Sorensen v. CHT Corp.*, 2004 WL 442638, at *6 (N.D. Ill. Mar. 10, 2004) (holding that the FLSA specifically addresses the situation where an employer "participates in a tip pooling arrangement by retaining a portion of the money, and provides that the appropriate relief is to deny the employer the use of the tip credit arrangement," and finding preemption of plaintiff's unjust enrichment claim on that basis); *Farmer*, 2010 WL 3927640, at *15 (breach of contract and unjust enrichment claims preempted where predicated on the same facts as FLSA claims).

Plaintiffs argue that Defendants' motion is at best premature as to the unjust enrichment claim—that is, that the Court must permit Plaintiffs' claim to proceed unless and until the Court or a jury concludes that PSI did not violate the FLSA. R. 333 at 24 ("An official finding of liability under the FLSA and/or IMWL has not yet been entered. When it is, Plaintiffs will be free to pursue this claim. Only if this Court or a jury finds Defendants are not liable under the FLSA and/or IMWL, would summary judgment be appropriate."). But Plaintiffs make no argument about their breach of contract claim, and none of the cases Plaintiffs rely upon support their argument. Instead, the cases make clear that as noted, common law claims are preempted where the conduct alleged also violates the FLSA. *See, e.g.*, *Sorenson*, 2004 WL 442638 at *7 (unjust enrichment claim preempted because there was no unjust enrichment absent a violation of the FLSA); *see also Morgan*, 625 F. Supp. 2d at 659 (same). Accordingly, summary judgment is granted to Defendants on Plaintiffs' breach of contract and unjust enrichment claims to the extent they arise from PSI's alleged tip credit and tip pool violations.

But Plaintiffs' common law claims also concern Defendants' alleged retention of mandatory service charges applied to private parties (which Plaintiffs contend is not tipped gratuity, but rather additional compensation akin to a bonus). R. 121, Counts IV and V. Defendants do not explain whether or how these aspects of Plaintiffs' claims are preempted, so their motion is denied to that extent.

## Conclusion

For the reasons stated, Defendants' motion is granted as to the tip pool claim; granted in part and denied in part as to the common law claims for breach of contract and unjust enrichment; and denied as to the credit card offset fee, sidework and notice claims. R. 306. Plaintiffs' motion is granted as to PSI on the credit card offset fee claim (including liquidated damages, but excepting Plaintiffs' claim that PSI's violation was willful), and denied as to the sidework claim. R. 312. Accordingly, of the claims currently before the Court, the sidework and notice claims will proceed to trial, as will certain aspects of Plaintiffs' common law claims (described above), the credit card offset fee claim as to Cortes, and Plaintiffs' claim that PSI's credit card offset fee violation was willful. And because neither party moved for summary judgment on Plaintiffs' Illinois Wage Payment and Collection Act claim (Count III), that also will proceed to trial. A status hearing is set for January 21, 2020. A week prior to that status, the parties are to submit a joint statement indicating their respective positions on which aspects of Plaintiffs' FLSA and IMWL claims (Counts I and II) that are not expressly addressed in this order remain.

ENTERED:

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: December 23, 2019